Bennetta B. DEHONEY, Respondent,

v.

B-W BRAKE COMPANY, Employer and Travelers Insurance Company, Insurer, Appellants.

No. 44075.

Supreme Court of Missouri.

Division No. 1.

Sept. 13, 1954.

Clay C. Rogers, Lyman Field, James W. Benjamin, Rogers, Field & Gentry, Kansas City, for appellants.

Stanley J. Siegel, Sylvester Powell, Jr., Kansas City, for respondents.

VAN OSDOL, Commissioner.

This is a workmen's compensation case.

A referee made an award in favor of employer B-W Brake Company, a corporation, and its insurer, and against claimant, the widow and guardian of the minor children of Flavius J. DeHoney, deceased employee. Upon review, the Industrial Commission reversed the referee's award and made the general finding that Employee sustained an accident on August 7, 1951, arising out of and in the course of his employment with B-W Brake Company, resulting in his death on the same day. More specifically, the Commission found that "Employee, a traveling salesman, was driving into tourist court (motel) where he had a reservation for sleeping accommodations while attending to his employer's business while on the road, when his automobile collided with another vehicle." Total death benefits of $12,000 were awarded by the Commission, and the additional sum of $150 was allowed for burial expense. Upon appeal, the Circuit Court of Jackson County by its judgment affirmed in all respects the award of the Commission. Employer and its insurer have appealed from the Circuit Court's judgment.

Herein upon appeal the question for our decision is whether the Commission's findings and award were supported by competent and substantial evidence upon the whole record. Wood v. Wagner Electric Corporation, 355 Mo. 670, 197 S.W.2d 647; Const. Art. V, § 22, V.A.M.S. However, before examining the evidence, we pause to observe that it has been frequently said an accident resulting in injury (or death) to an employee arises "out of" the employment, Section 287.120 RSMo, V.A.M.S., when there is causal connection between the conditions under which the work is required to be performed and the resulting injury; and that an injury to an employee arises "in the course of" his employment when it occurs within the period of his employment, at a place where he may reasonably be, and while he is reasonably fulfilling the duties of his employment or engaged in doing something incidental thereto. Wahlig v. Krenning-Schlapp Grocer Co., 325 Mo. 677, 29 S.W.2d 128;

Goetz v. J. D. Carson Co., 357 Mo. 125, 206 S.W.2d 530; Karch v. Empire District Electric Co., 358 Mo. 1062, 218 S.W.2d 765; Sanderson v. Producers Commission Ass'n., 360 Mo. 571, 229 S.W.2d 563; Sylcox v. National Lead Co., 225 Mo.App. 543, 38 S.W.2d 497. But it is thought that no all-embracing definition of the phrase "arising out of and in the course of his employment" has yet been framed. Every case involving the phrase should be decided upon its own particular facts and circumstances and not by reference to some formula. Leilich v. Chevrolet Motor Co., 328 Mo. 112, 40 S.W.2d 601; Wamhoff v. Wagner Electric Corp., 354 Mo. 711, 190 S.W.2d 915, 161 A.L.R. 1454; Goetz v. J. D. Carson Co., supra; Foster v. Aines Farm Dairy Co., Mo.Sup., 263 S.W.2d 421.

Employee, Flavius J. DeHoney, had been employed by Employer, B-W Brake Company of Kansas City, since about 1942. Employer was engaged in the business of "brake service and supplies." Employer distributed frictional materials such as clutches and power devices for heavy-duty automotive equipment. Employee had worked in Employer's "parts" department, until about a year and a half before the accident, and then Employee was put "on sales." His principal duties were making sales, building up "good will", and developing new accounts. He worked principally in Kansas City, but he also traveled and worked outside of the City. On the expeditions without the City, he would "make up his own route, people that he would want to call on." He called on automotive dealers, car agencies, trucking agencies, and industrial and commercial establishments in Kansas and Missouri, within a radius of two hundred miles from the City—there was no special territory to go on at any special time. He was paid a straight salary, and travel expense. He owned his own automobile, and was periodically reimbursed for the items of expense in operating the car. He "just sort of free-lanced" in development of the trade territory. Sometimes he would be away for as much as four days. Sometimes he went on trips for Employer without any notice of destination. Employer's president said, "I trusted him, allowing him to use his head, thinking he was as much interested in the building of the business as I was." Employee was advanced or reimbursed for expense, "hotel, food and so forth", according to the expense reports he turned in to Employer.

In July 1951, the Kaw River valley was inundated by disastrous floods. Sunday, August 5th, Employee made plans to visit the areas at Topeka and Lawrence and to analyze the effect of the floods. As a salesman he had not visited the "trade" in those areas since the preceding April. He talked of making a trip to Topeka. He did not plan to take his wife along, as he sometimes did. He said, " 'Well, not this time because it is going to be a hot long dirty job. I am going to be working late and early, and I wouldn't know how much time I would be able to spend with you.' " He was going to a lot of places in Topeka, but the "trucks and things would be out, just like our trucks were here, where they tried to get them out of the flood." He also planned to go to Lawrence, if time permitted, "and I believe he mentioned Manhattan."

Employee left his home at ten-thirty or eleven o'clock the morning of Monday, August 6th. He took "just work clothes—slack pants and wash things." He had theretofore called Employer's president who testified that he had been endeavoring to find out how much equipment had been damaged in the flooded area along the river banks at Lawrence and Topeka. "We hadn't been out in that territory and had been very busily engaged in Kansas City proper and he (Employee) thought it would be a good idea to find out how much equipment had been ruined out along the river in Topeka and Lawrence and the little towns along the flooded area. * * * I told him I thought it would be a very good idea. He said then, with my permission, he would go on the trip and had to have some money. I gave him $50.00 advance account—." On this particular project, Employee would be "just as likely" working at night as in the daytime, because "they were

working day and night" in uncovering and recovering materials.

Employee was next seen that day during the lunch hour in a restaurant in Kansas City. He said to a friend that he had to be in Topeka that evening—he was in a hurry.

Employee "registered in" at the White Eagle Motel two and two-tenths miles south of Topeka. This was in the early afternoon of the same day, August 6th. He paid for two nights lodging in advance. He took the key, inspected the room, and departed, saying he would "be here selling for two days." He called on a regular customer, Mosby-Mack Motor Company of Topeka, in the afternoon between three-thirty and five o'clock. Mosby-Mack's "parts clerk" was busy. Employee said,

" 'I see you are busy, I'll see you tomorrow.' " Mosby-Mack's clerk testified that after the flood Mosby-Mack's place of business continued to be "officially" open from seven in the evening until two the following morning, "but sometimes when we were busy we didn't get away from work until four or five o'clock in the morning."

At about twelve-thirty in the morning of August 7th, Employee was driving north on U. S. Highway No. 75, a four-lane, north-south highway with sodded medial strip. He turned his automobile westwardly toward the White Eagle Motel, and as he moved across the west side of the highway his automobile was struck by a southbound motor vehicle. He was fatally injured. Papers were blown all around the scene of the accident. The papers were definitely connected with Employer's business. A "couple of sales grips" were inside the demolished car. The grips were those normally carried by Employee in his territory; "what was left of them contained the remains of catalog sales information."

Later, at the request of claimant, a competent investigator tried to find out just what Employee was doing during the approximate seven and one-half hours between the time of his call at the place of business of Mosby-Mack and the time of the accident. The investigator had been supplied with a list of the customers on whom Employee regularly called. No information was obtained as to Employee's activities during the stated interval of time.

Employer introduced into evidence a part or segment of a road map, the map being of the type prepared for nationally known gasoline distributors. The map shows the major improved highway systems, state and national, in the area in Kansas west of Kansas City and including the cities of Topeka and Lawrence. The map shows U. S. Highway No. 75 as a north-south highway proceeding directly south from Topeka. On this map no highways, major or ancillary, are shown in the immediate area southeast of Topeka upon which a traveler from Lawrence, or points to the westward thereof, could drive to U. S. Highway No. 75 and approach the White Eagle Motel on that highway from the south.

Employer and its insurer, appellants, contend that here Employee, while on the particular mission involved, was not making a regular trip as a salesman in his territory within the radius of two hundred miles of Kansas City, but, instead, was making a journey "for a specific purpose" not directly connected with his regular work as a salesman. Appellants say that the *area* of DeHoney's special mission was definitely marked out as the "river banks of the Kaw River in the flooded area at Lawrence and Topeka." Appellants also urge that employee DeHoney admittedly met with the fatal accident when he was two and two-tenths miles *south* of Topeka (on the opposite side of that city from the formerly flooded area) and when, late at night, he was coming from the south in approaching the scene of the impending accident at or near the White Eagle Motel, a considerable distance away from the "area of operations of his special mission", and so they say the evidence fails to show Employee was at a place where his employment required him to be. Appellants also point out that employee DeHoney was last see not later than five o'clock in the afternoon of August 6th and met with the fatal accident and in-

jury at twelve-thirty in the morning of August 7th—there was a seven-and-a-half-hour hiatus in the shown activities of Employee. Appellants then assert there was no circumstantial evidence of compensable accident in the case, such as evidence that an employee is traveling on a "usual route" or is in an area where his employment requires him to be. Consequently claimant-respondent failed, appellants say, in sustaining her burden of proving that the death of Employee was by accident arising out of and in the course of his employment. But, in our opinion, the evidence we have stated, supra, justified the findings and award of the Commission in favor of claimant. We think there was substantial evidence tending to show the fatal accident arose out of and in the course of the employment.

In the beginning of our examination of the evidence we have noticed the circumstance of the inundation of the Kaw River valley in July 1951 destroying or damaging automotive equipment, and the subsequent efforts of owners to salvage and restore or repair the damaged equipment and materials. There is the clear inference that these efforts of owners were supplemented and aided by the "overtime" work of dealers, repairmen and distributors. Into such an area or areas Employee, with Employer's approval, moved in the furtherance of his employer's business as a restorer and distributor of such equipment and materials. He was also Employer's salesman in a territory embracing these areas. Manifestly one of the purposes of his trip was to examine and analyze and to exploit the unusual demand for materials of which his employer was a distributor; and we believe the evidence also justifies the conclusion that another purpose was to call on regular customers whom Employee had not seen since the preceding April.

As usual, Employee was paid or advanced or was to be reimbursed for his travel expense and for his expenditures for food and lodging. Travel was contemplated in the performance of his duties. Travel, if indeed not a part of, was at least incidental to the employment. San-

derson v. Producers Commission Ass'n, supra; Sylcox v. National Lead Co., supra. It was clearly presupposed that he was to remain in and obtain lodging within the area while on his mission. Although there was no direct evidence introduced tending to show the actual activities of Employee for several hours preceding the fatal accident, there was no direct evidence that, during that period of time, he had unnecessarily and unreasonably departed from and had abandoned his duties to his employer. He was at a place where he reasonably could have been, in view of the broad duties to which he had been assigned as disclosed by the evidence. We stress the broad "scope" of the employment. And he was fatally injured in an accident which occurred as he was returning to the place of lodging he had selected, and within the period of his employment. He was a man who was devoted to the furtherance of the business of his employer, who had gone out, with the approval of his employer, with no orders or direction as to the persons on whom he was to call or as to the routes he was to travel. His discretion in the furtherance of Employer's business was given and relied on by his employer. He had entered upon his mission expecting to work early and late in accomplishing his employer's objectives. Although the inference (that he was returning to his lodging from a place where he had been engaged in selling or analyzing sales conditions) is not especially a strong one—it is not supported by direct evidence—yet we think the inference that he had been so engaged is supported by substantial evidence circumstantially. Wahlig v. Krenning-Schlapp Grocer Co., supra; Goetz v. J. D. Carson Co., supra.

It is true that Employee, in approaching the White Eagle Motel, was traveling northwardly, inferentially having been somewhere south, southeast or southwest of Topeka, and it seems the actual area devastated by flood was north of Topeka. These facts certainly do not conclusively show he had abandoned his employment and had been engaged upon a mission of his own, especially when the shown broad scope

of the employment contract is considered. It would be too narrow to conclude from the evidence that the area of Employee's mission was confined to the cities of Topeka and Lawrence and to the very areas along the banks of the Kaw. In our view, the Commission was justified in believing, as it probably did, that Employee, when on the trip herein involved, was at a place where he might reasonably have been when he was anywhere within the general area, at least anywhere within the confines of his territory extending two hundred miles from Kansas City. Surely automotive equipment was damaged along the banks of the Kaw, but it would be too much to ask one to suppose that the owners of the damaged equipment and dealers supplying such owners all lived or operated in Topeka or Lawrence or in the actual areas which had been inundated by the floods. The owners or their dealers, or some of them, may have lived any direction and miles away from Topeka or Lawrence and the Kaw River valley. Some of them probably lived in the "little towns along the flooded area." Now, Employer's map, introduced as an exhibit, did not purport to show ancillary or subsidiary highways. The map does not compel the conclusion that Employee, in the course of his employment, could only travel over the major highways in Kansas.

Nor does the fact of the lateness of the hour of Employee's travel to the place of his lodging seem of much weight or value on the issue, in view of the evidence of the overtime efforts to recover and restore the equipment damaged by the floods. And it would seem the evidence, negative in character (that an investigation failed to reveal the whereabouts and the activities of Employee during the several hours preceding the accident), was not of such weight as to preclude or destroy the inference of compensable accident. In this case, Employee's duties included calling on regular customers, but, as stated, he had the other duties of analyzing trade conditions and procuring new business. He reasonably could have been visiting those whose identity a much more minute investigation might not have disclosed. He may have been interviewing owners or dealers in equipment on whom he had never before called. Anyhow, there was little or no factual support for an inference that he had abandoned his employment and had been engaged in any independent personal mission of his own.

It is said by appellants that Missouri has never extended its Workmen's Compensation Law to cover salesmen on the road while staying overnight at hotels or motels, and that the Law should not be so extended unless at the time of the accident the employee is actually working or conserving his employer's property. In our case, it would seem unnecessary to examine this assertion. Employee was not injured while staying at the White Eagle Motel. He was going to the motel at the time of the accident. We do not desire nor should we attempt to formulate a rule, relating to the extent of the coverage of the Law as to salesmen on the road, applicable to any and all cases. Herein, we only give our opinion, within the authorized scope of our review, upon the evidence introduced at the hearing of the instant claim for workmen's compensation.

The judgment should be affirmed.

It is so ordered.

LOZIER and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.