Ester Lucille LAKE, Widow, and Lawrence Edward Lake and Carol Leon Lake, Children of Deceased, Respondents,

v.

MIDWEST PACKING COMPANY, Inc., Employer, and Continental Casualty Company, Insurer, Appellants.

No. 45440.

Supreme Court of Missouri, Division No. 2.

May 13, 1957.

Warren D. Welliver, Columbia, for appellants. Alexander, Welliver & Wayland, Columbia, of counsel, for appellants.

Charles A. Powell, Jr., Macon, for respondents.

BOHLING, Commissioner.

The employer, Midwest Packing Co., Inc., and insurer, Continental Casualty Company, appeal from a judgment affirming an award under the Workmen's Compensation Act to the widow and minor children of John G. Lake, the employee, of $12,000 for the death and $371.36 for the funeral expenses of the husband and father.

The employer operates a dead animal rendering business near Macon, Missouri. John G. Lake was the employer's "cut-up man" and died at the plant on June 27, 1954, from a heat stroke. The claim was submitted on the testimony of claimants' witnesses. The employer offered no witness. The sole contested issue is whether there was sufficient evidence to sustain the finding that the employee's death arose "out of and in the course of his employment." § 287.120. Statutory references are to RSMo 1949, V.A.M.S. Other facts involved in an award of compensation need not be developed.

■ The parties are agreed: "The applicable rule, which is invoked by the defendants, is that, if an employee, because of his duties, is exposed to a special or particular danger from the elements, such as heat, cold, lightning, or windstorm—a danger that is greater than that to which other persons in the community are subjected—an injury resulting from such exposure is compensable under the Compensation Act. If the character of the employment is such as to intensify the risk, the resulting injury is compensable. The causative danger must be peculiar to the work, and not common to the neighborhood. In other words, an injury resulting from the elements, like any other injury, to be compensable, must arise out of the employment, as well as in the course of the employment." Kripplaben v. Joseph Greenspon's Sons Iron & S. Co., 227 Mo.App. 161, 50 S.W.2d 752 [1–3]. See also Bicanic v. Kroger Grocery & B. Co., Mo.App., 83 S.W.2d 917, 922; 58 Am.Jur. 760, § 260; Larson's Workmen's Compensation Law (1952), § 8.41.

■ The first hearing was before a referee (§§ 287.460, 287.610) and resulted in an award of no compensation. Claimants filed a timely application for review. § 287.480. Thereafter additional evidence was adduced before the members of the Industrial Commission of Missouri and resulted in the award under review. It was within the discretion of the Commission to review only the evidence already taken or to hear further evidence. Waterman v. Chicago Bridge & I. Works, 328 Mo. 688, 41 S.W.2d 575, 578 [10]; Hohlstein v. St. Louis Roofing Co., Mo.App., 49 S.W.2d 226, 228 [1]; Ross v. Joplin Corp., Mo.App., 229 S.W.2d 303, 310 [6]. All the evidence in the case was before the Commission for consideration in arriving at its award.

■ We review the whole record, including the legitimate inferences to be drawn therefrom, in the light most favorable to the award of the Commission; and by competent and substantial evidence, and if the Commission's findings are supported not contrary to the overwhelming weight

of the evidence, the award is to be sustained. Spradling v. International Shoe Co., 364 Mo. 938, 270 S.W.2d 28, 30 [2]; Dehoney v. B-W Brake Co., Mo., 271 S.W.2d 565, 566 [1]; Worley v. Swift & Co., Mo.App., 231 S.W.2d 828, 831 [1].

The employer's plant, a two-story building, is over an old mine shaft, and sits in a depression, downgrade from all points, quite a bit below the surrounding terrain. Cement walls extend in places a short distance above the first floor and the upper walls are wood siding. The roof is the only ceiling to the second floor. There is no shade around the building, which had no insulation. Fans, if there were any in the building, were not in operating condition or, at least, not operating on the day involved.

The second floor is a large room, with four windows in the south and nine windows in the west wall. These windows and doors were open. There are two ramps on the north side to this second floor room. Carcasses are unloaded and piled inside the entrance at the west ramp. A 2,000 pound hoist is mounted in the roof, which is specially braced to support the load. Harry Dawson, the manager of the plant, testified this hoist was about 6 to 8 feet west of the cooker domes. The hoist is used in connection with the skinning and cutting up of the carcasses, which work is conducted about 14 feet north of the south wall. After dissecting, the meat is dropped into the two cookers and dry cooked under steam pressure. The lid of each cooker is about 20 inches across and 4 or 5 inches thick and extends above the floor of the large room.

The two cookers are side by side on the first floor and, we understand, just to the east of where the cutting occurs on the second floor. The cookers are cylindrical, approximately 10 feet long by 4½ feet. Another shell is around each cooker, there being a space of about 3½ inches between the two cylinders, which contains the steam. With the wheels and shafts, the cookers have and overall length of about 18 feet. If we understand correctly, the cookers have containers, separated by fine screens, which permit the grease to go down. The heavier mass, after cooking, is placed in hydraulic presses, held fifteen minutes, squeezing any remaining grease out and leaving the material in a hard cake. Two coal-stokered steam boilers are located at the east entrance to the plant.

The hide room, where hides are salted and stored for marketing, is a small one-story room at the south part of the plant. It has an 8-foot roof at the lowest point.

C. Esthel Grett was manager of the employer's plant between August 1, 1948, and June 1, 1954, when a disagreement arose, not a big issue, and his employment terminated. Harry Dawson succeeded Grett as manager. He had worked at the plant for six or seven years and testified that on the day of Lake's death the plant was in the same condition it was in while Grett was manager.

The plant seldom "cooked" on Sundays, but usually operated until 3:30 a. m. Sunday morning. Dawson stated the plant may have shut down earlier on Sunday, June 27, 1954, perhaps between 12 m. and 3 a. m., as they intended to wash the boilers. It had been in operation day and night for several days.

Mr. Grett, who had personally performed all types of work done at the plant, testified that the cookers, when in operation, become hot and radiate heat; that the material in the cookers becomes boiling hot and semi-liquid in form, and retains its heat for twelve or fourteen hours if the top seal is not broken. The lids of the cookers (they fit on a gasket) on the second floor become hot. Steam escapes when the lids are opened.

The two presses are operated by steam pressure, become hot, and leak steam while in operation.

The testimony was that there was much more business in the Summer than in the

Winter; that the carcasses decompose more in hot than cool weather, and in the Summer are in pretty bad shape on account of the heat.

Cold water would not clean the second floor where the carcasses were skinned and cut. It had to be scrubbed. A "mixer" was used to wash the second floor; that is, live steam, to build up the pressure, and water was used, and the steam caused the water to be very hot. The floor did not drain properly, had to be swept to get rid of the water, and water stood on the floor were the cutter worked practically at all times.

Arlie Kerr was plant foreman and usually did the skinning. He testified that when the "cookers are not running" they were "just shut off"; that "they don't aim to let them cool off"; "They just let them go. They just turn them off and let them go." Asked: " * * * do they open them up and let all the heat out or not? A. No, they don't open all that. They just turn them off and just let them sit."

Grett testified that the "cut-up man" had to use an axe or a cleaver, and the work made one sweat profusely, and that although the plant was not operating on Sundays, it would continue to be much hotter in the plant than elsewhere. Dawson, when asked whether the plant cooled off on the day it was idle, answered: "Well, I wouldn't say it cooled off very much. "Q. Well, would you say that it continued warm in the plant even when it wasn't operating? A. I would say it would, yes."

Mrs. Lake testified that her husband had not had any sickness in recent years, and when he left home for work on June 27, 1954, there was nothing unusual about his appearance or health.

The parties agreed that on Sunday, June 27, 1954, the government records showed the thermometer registered 99 degrees in the shade. Lake and Kerr, who was to wash the boilers, were working at the plant that day. Dawson was in the office.

Harry Leedom, who drove a truck for the employer, testified that between 1 and 2 p. m. June 27, 1954, he unloaded carcasses at the plant and cleaned the truck; that it was not fair to ask him whether it was hotter in the plant than outside, because it would be hotter any place after getting out of the breeze created by traveling; that it was "miserably hot" inside the plant and "miserably hot outside too"; and that he was sweating more inside the plant than in the truck; that he helped skin one animal, Lake having asked him to run the wench, he thought because the horse was in a condition that might result in pulling the hide in two. Leedom stated Lake asked him if he were sweating, and he answered " 'I sure am' "; that Lake then said " 'I'm not sweating a drop' "; that Lake complained about his inability to sweat, stating he couldn't sweat; and that he, the witness, looked at Lake and "didn't see any sweat on him." This witness stated the floors were not clean; there were drippings and seepage on the floor, and it was more humid and sultry inside the plant than outside.

Kerr testified he was "skinning" in the morning; that in the afternoon he was washing the boilers and was again upstairs after 4 p. m.; that Lake stated at noon he was not feeling good and, about 4 p. m. that "he didn't think he was going to get done"; that they salt the hides the last thing and they had thirteen hides to salt. The last work Lake did was "salting hides" in the hide room. The door of the hide room was kept locked and the four windows were nailed on the side. The door was open but the windows were closed while Lake was working in the hide room, and there was no artificial ventilation in the room. Kerr noticed that Lake was not salting the hides properly and he told Lake he could leave. Kerr followed Lake upstairs and noticed Lake "kinda faltered" going up the steps and held onto the banis-

ter. The men usually change their clothing and take a shower. Kerr testified Lake took his boots off and went downstairs barefooted, which was unusual. Then Kerr heard an unusual noise downstairs and, upon going downstairs, found Lake on the floor and unconscious.

Dr. James E. Campbell, when called, went immediately to the plant, arriving about 6:10 p. m. Lake was about 15 or 20 feet inside the entrance to the first floor and did not respond to treatment. He died 15 or 20 minutes later. Dr. Campbell testified that Lake died of a heat stroke; and asked whether he had any doubt about it, he answered: "No, sir. Not a bit." We need not detail his explanation. There is no testimony of record contra. It had substantial probative value. He stated most cases of heat stroke occur to people engaged in work; that hard physical labor produces body heat; that when excessive body heat causes the brain center controlling the body temperature to lose its power the body temperature rises suddenly, and that Lake's death was due to terrifically high body heat. He stated the day was hot; that it was much hotter in the building (it was getting the full blast of the sun) where Lake was found than outside; that the air was not circulating there and the odor was stifling, and that Lake, had he not been working, would very probably have gotten out of the heat and lived.

 We do not state some additional testimony favorable to claimants.

The employee was at a place where he was reasonably required to be in performing his duties when he sustained his injury. His death occurred in the course of his employment. Spradling v. International Shoe Co., 364 Mo. 938, 270 S.W.2d 28, 30 [3]; Dehoney v. B-W Brake Co., Mo., 271 S.W. 2d 565, 566. And, notwithstanding the fact that the boilers, presses and cookers were not in active operation during the day of the employee's death, when we give consideration to Kerr's testimony that the cookers were not opened to let the heat out but were merely shut off and permitted to stand, and Grett's testimony that they would continue to give out heat for a considerable length of time and the plant would continue much hotter than elsewhere, corroborated to some extent by the testimony of Dawson, the manager, that the plant would not cool off very much the day it was idle, and the fact that the means for artificial ventilation of the plant, if available, were not being used, the preponderance of the evidence is to the effect that the employee's place of work and work was such as to intensify the risk and subject him to greater exposure of a heat stroke than was common to the general public in the same locality. Wessel v. St. Louis Car Co., 235 Mo.App. 499, 136 S.W.2d 388, 391 [3]; McCarthy v. American Car & F. Co., Mo.App., 145 S.W.2d 486, 488, 489; Bicanic v. Kroger Grocery & B. Co., Mo.App., 83 S.W.2d 917, 923; Kripplaben v. Joseph Greenspon's Sons Iron & S. Co., 227 Mo.App. 161, 50 S.W.2d 752 [4], among others; Annotation, 83 A.L.R. 236. Claimants were not required to establish the exact temperature in the plant by thermometer readings. Bicanic v. Kroger Grocery & B. Co., supra, 83 S.W.2d 923 [5]; Muesenfechter v. St. Louis Car Co., Mo.App., 139 S.W.2d 1102, 1105, 1106.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BOHLING, C., is adopted as the opinion of the court.

All concur.