**Floyd JETT, Employee, Appellant,**

v.

**CHAIN OF ROCKS AMUSEMENT PARK,**
Employer, and London Guarantee and Accident Company, Insurer, Respondents.

No. 30894.

St. Louis Court of Appeals.

Missouri.

July 17, 1962.

Rehearing Denied Sept. 11, 1962.

Vernon C. Oetting, Ernest L. Keathley, St. Louis, for appellant.

Fred B. Whalen, Whalen O'Connor & Grauel, St. Louis, for respondents.

DOERNER, Commissioner.

This claim for compensation under our Workmen's Compensation Act was filed by the employee, Floyd Jett. The referee who heard the claim and the Industrial Commission on review found against the employee and a final award was entered denying compensation. On appeal the Circuit Court of the City of St. Louis affirmed the final award and the employee appealed to this court.

In 1958, and for some years prior thereto, the employee was employed during the summer season by the employer, Chain of

Rocks Amusement Park, as the operator of a ride known as a "swooper." In his claim the employee alleged that on July 26, 1958, he slipped while ascending some steps inside the ride enclosure, injuring his right ankle and leg, which aggravated a pre-existing osteomyelitis of the right leg and necessitated the amputation of that member above the knee. The employer and insurer by their answer denied the occurrence of any accident, denied that the employee had sustained an accidental injury, and denied that the amputation was necessitated by or connected with any accidental injury. As an additional defense they also alleged that the employee had failed to give the notice required by Section 287.420 of the Act.

At the hearing the employee testified that he developed osteomyelitis in his right leg below the knee in 1929, when he was 12 years old, following an accidental blow with the hammer. He testified that shortly thereafter the leg began to drain, and that from that time on, until the amputation in 1958, it would alternately heal and drain. He stated that the leg had not incapacitated him from working, and that he had performed hard manual labor of various kinds all of his life. In describing the accident he testified that about 3:30 or 4:00 P.M., on July 26, 1958, while ascending the steps of the ride, his left foot slipped, causing him to pitch face forward and to slide down the three steps on his stomach. His right ankle and the middle of his right shin struck the steps, causing the ankle to be bruised and the shin to be skinned. He said that he had been in the rest room at 1:00 P.M. and that his leg had not been draining at that time, but that immediately following his fall, "I got up and started to walk and I could feel it oozing out." From that time on until the amputation, he claimed, it continued to drain. He said that he worked the balance of that day, and also the next day, although his leg was swollen and hurting him, and continued to work off and on until August 10, when he couldn't get out of bed. He rubbed

liniment on his leg, and on August 13 he went to the clinic at City Hospital. Asked what the condition of his right leg was on that day he replied that "It was swollen up and running," and that he was using crutches because he wasn't able to stand up and support his weight without their aid.

On cross-examination the employee testified that his right leg had been bowed ever since the osteomyelitis developed in 1929. He admitted that on the day of the accident he had bandages on it, although it was healed at the time, and explained that he wore them because he never knew when the leg would open and start to drain. He was operated on at Barnes Hospital in 1936, and the leg stopped draining, but after about a year it opened up again. He stated that after 1945 the leg stopped draining "One or two times," but that he couldn't remember when. Later he stated that it drained off and on, but the better part of the time. The employee admitted that as early as 1945 he had been in City Hospital because of his leg, and had been advised at that time that it would be best for him to have it amputated. He acknowledged that when his deposition had been taken, and he was asked whether he had been in the City Hospital in 1939, he answered that he had been in and out of the hospital so many times he didn't know, and testified at the hearing that he really didn't know. He recalled that he had entered City Hospital in 1950, because his right ankle had been injured, and that from time to time thereafter, when his leg would swell and pain him, he would obtain pills for the pain and treatment for the swelling at the hospital's clinic. He also recalled that he had again been a patient in City Hospital in 1957, after he bumped his knee at work. He admitted that on every occasion when he was a patient in the hospital he was advised to have the leg removed and that he refused to do so, because "I wanted to keep it as long as I could." At one point he stated that the leg began to drain through a second opening in 1950, but he subsequently said that the second drain

didn't open until 1957. He admitted that one hole or spot was getting larger all of the time, and when asked whether the drainage ever stopped and the opening healed after 1957 he replied, "It would check it a lot but it wasn't all the way healed, no."

The employee testified that the skinned place on his shin cleared up in two or three days after his fall on July 26, 1958, and that the small bruise on his ankle cleared up in about three days; that there wasn't any indication on the leg to indicate an injury to his ankle when he went to City Hospital; that while he told Mrs. Trippe, the manager of the Amusement Park, and his foreman, Esposito, that he had fallen at work and hurt his ankle, he never asked either of them to furnish him medical attention; that he didn't go to a doctor until he went to the City Hospital clinic on August 13 for pain pills because for the preceding three days his leg had been hurting him; that he didn't know whether or not the injury he received in falling on the steps had any effect on his upper leg; and that he decided to have the amputation in 1958 because his leg was hurting so bad. He was asked on cross-examination:

"MR. WHALEN: When did you first decide that this fall on the steps that you are testifying about, had anything to do with causing your leg to be removed?

"A. I decided that after I was in the hospital.

"Q. When?

"A. It was after it was cut off. I was laying and thinking, I had a lot of time to think."

Witness Charles Wade testified that he was also working at the Amusement Park on July 26, 1958, about 20 feet from where the employee was located; that he saw the employee slip and fall on the steps, and assisted him to his feet; that the employee complained that his right leg and ankle hurt him; and that he saw swelling immediately afterwards in the leg and ankle. On cross-examination he stated that all he saw was the employee's ankle and about 6 inches above it, and that he didn't know whether the employee was wearing a bandage.

Dr. William H. Grundmann, the employee's medical witness, described osteomyelitis as an inflammation of the bone, caused for the most part by a blood borne infection, and a blow at the part of the bone where the osteomyelitis develops. He stated that an osteomyelitis condition could be chronic, that is, stationary, with no continuing progress in the destruction of the bone, even though it continued to drain; or it could be acute, in which the clinical symptoms would be pain, swelling, redness, and increased discharge and disability. A lengthy hypothetical question was propounded to the doctor, in which he was asked to assume, among other facts, that the employee fell and struck his right leg below the knee on July 26, 1958; that his right leg and ankle immediately began to swell, and his osteomyelitis immediately began to discharge; that for 10 days after July 27 the swelling remained and the discharge continued; that because of the increased swelling and pain he was unable to work; that he entered the City Hospital on August 13 and his right leg was amputated the next day; and that the employee had fractured his ankle in 1950 and injured his right knee in 1956, but that no permanent injury resulted from either of those accidents. The doctor stated that assuming that the two prior accidents had not resulted in any permanent disability or injury, "On the basis of the hypothetical question, * * *" it was his opinion that the last blow would have been the factor which necessitated the amputation. The doctor was not asked to assume that the employee had been advised in 1945, 1950 and 1956 that his leg should be amputated, nor was he asked on cross-examination whether such facts would have altered his opinion. Neither was he asked to assume that x-rays made in 1958 showed an area of rarefaction much more extensive

and with many more sequestrum formations when compared with those taken in 1950.

On cross-examination Dr. Grundmann stated that he hadn't seen the x-rays taken of the employee, and that comparative x-rays were the best means of determining whether the destruction of the bone had progressed during the interval. He admitted that the opening of a second sinus or drain would mean that there had been a progression of the osteomyelitis and that it had probably spread to another area, and that a bowing or deformity of the bone might also indicate the progress of the disease. He also stated that in diagnosing osteomyelitis as acute the manifestations, in addition to a discharge or increase thereof, would be swelling, pain and disability.

Dr. Justus W. George, a resident in surgery at City Hospital, who performed the amputation of the employee's leg, was called as a witness by the employer and insurer. He testified that he examined the employee and took a history from him on August 14, 1958. His examination disclosed several open areas just below the right knee which were draining purulent material, that the lower leg was bowed and the limb was one centimeter shorter than the left one, and that the convexity was such that the employee was not walking with a normal gait. Although the employee told him of dislocating his ankle in 1950, and of the recommendation made at that time of amputation, the employee did not tell him of any recent injury, made no complaint of pain, and in his examination the doctor found no evidence of any recent injury. At the time he examined the employee he had available to him the records of the employee's prior hospitalization at City Hospital, including the reports of the x-rays made on May 14, 1950, November 21, 1956, and the x-rays made on August 13, 1958, the day before his examination. The latter x-rays revealed, "Examination of right leg in AP and oblique views to include the knee and ankle joint, reveals the previously described area of rarefaction, sclerosis, and periosteal proliferation involving the proximal 3rd of the tibia. The area of rarefaction compared with roentgenogram of 11–21–56 is much more extensive and many sequestrum formations are noted." Sequestrums, the doctor explained, were pieces of bone which had been deprived of their supply of blood. He said that the tibia, the weight bearing bone, had been affected by the destructive process to the extent of $\frac{1}{10}$ to $\frac{1}{8}$ of its length, and from 30 to $33\frac{1}{3}$ per cent of its thickness, but that there was no osteomyelitis in the fibula. He diagnosed the employee's condition as chronic osteomyelitis of long duration, found nothing to indicate that a recent trauma had caused or aggravated the condition, and in his opinion the condition of osteomyelitis he found had not been brought about by any recent trauma.

The doctor further stated that the employee was examined by other physicians, and that the recommendation that the leg be amputated was made after their evaluation and consultation. He testified that the leg was a viable or live leg, and that there was no urgent emergency which required its immediate removal, but that the amputation was recommended because of the past history of the patient's trouble, the deformity, and the danger that the infection might spread throughout the employee's system and deteriorate other organs in his body. The employee told him, in fact, that he had lost 10 pounds in weight in the prior 6 months. He stated that if the employee had chosen not to have had the leg removed the employee could have been walking on it at the time of the hearing, but that he would have continued to have had episodes of drainage. The doctor performed the operation on August 15, 1958.

On cross-examination Dr. George testified that he had no recollection and had no record that the employee complained of pain, or of any recent fall and injury to his leg, and that his recollection was that the employee was able to walk at the time he examined him. He stated that a trauma could reactivate a latent osteomyelitis which had not been draining, and that in his opin-

ion if there had been no drainage prior to the trauma, and a discharge began afterwards, it would indicate that the trauma had reactivated and aggravated the latent osteomyelitis.

On behalf of the employer and insurer, and by agreement, portions of the City Hospital records were read into evidence. Briefly summarized, they showed that the employee entered the hospital as a patient on May 14, 1950, because of a dislocated ankle suffered from a fall in his home. The history recorded was that the osteomyelitis began in 1929 following a blow by a hammer; that in 1936 an operation known as a saucerization, in which the diseased bone was removed, was performed at Barnes Hospital. Physical examination made in 1950 showed a large 5 to 6 centimeter ulceration with a foul-smelling purulent discharge present. The radiological examination revealed the angulation or bowing of the right tibia and an old osteomyelitis. The record showed that at a staff conference held on May 15, 1950, the consensus of opinion was that the leg should be amputated or saucerized, with the final judgment to be made by the patient. On June 3, 1950, after a discussion with Dr. Horwitz, it was decided that the saucerization would have to be so extensive that it might compromise the structural integrity of the tibia. An authorization for the amputation signed by the employee was introduced into evidence, but the hospital record showed that he decided to wait, and that he was discharged to the clinic where the osteomyelitis was to be continually observed. The record of the clinic showed that the employee did not return for observation. The records further showed that the employee was again admitted to the City Hospital on November 21, 1956, with a history of having fallen at work and of hitting his right knee on a brick floor. The physical examination disclosed a swollen, contused, and tender knee, as well as what was described as an old osteomyelitis at the proximal and middle third of the right tibia. The x-ray examination revealed a gross deformity and irregularity of the proximal portion of the tibial shaft and enlargement of the shaft and sclerosis from the osteomyelitis.

The record of the City Hospital's emergency admitting room, made on August 13, 1958, showed that the employee had been brought from home accompanied by his wife and brother, that he gave a history of having osteomyelitis since 1939 (1929?), that he complained of having had pain in his leg for the prior three days, and that he asked for pain pills. The physical examination showed two large, draining holes below the knee, and the diagnosis was chronic osteomyelitis. Emperin and codeine were prescribed, and the employee was referred to the orthopedic clinic. The record of the latter clinic, made August 14, 1958, showed that the employee entered for an elective amputation above the knee. The two sinuses which were draining were later measured in the pathological laboratory and found to be 3.5 by 2.5 centimeters and 2.5 by 2.5 centimeters. As previously stated, the x-ray made on August 14, 1958, revealed that the area of rarefaction was much more extensive than that shown in the x-ray made on November 21, 1956. The records further showed that after the operation on August 15, 1958, the employee made a satisfactory recovery and was discharged from the hospital on August 28, 1958.

Dr. A. H. Diehr, called as a medical expert by the employer and insurer, testified that he had reviewed the hospital's records of the employee's various confinements, including the x-ray and pathological reports, and that in his opinion they showed a very extensive osteomyelitis of long duration, with a gradual progressive destruction of the bone from the infection. He expressed the opinion, based upon the hospital records, that the employee's osteomyelitis was not aggravated by any accident, and that the amputation which the employee voluntarily chose to have performed was advisable and inevitable because of massive destruction of the bone.

Mrs. Margaret Trippe, the manager of the Amusement Park and president of the corporation, denied that the employee had ever reported his accident to her, and testified that the first she knew of the matter was when she received the notice of the claim for compensation, on September 12, 1958.

The referee found that the employee sustained an accidental injury to his right leg on July 26, 1958, and that the accident arose out of and in the course of his employment; but he also found that the employee lost no wages or time from work as a result of the accident; that he sustained no permanent disability therefrom and that no medical aid was needed or required because of the accidental injury; that the employee had osteomyelitis of the tibia of his right leg since 1929; that the osteomyelitis was not caused or aggravated by the accident of July 26, 1958; that the osteomyelitis necessitated the amputation of the employee's right leg above the knee; and that the amputation was not the result of or in any way connected with the accident of July 26, 1958. As stated, the Industrial Commission and the Circuit Court affirmed these findings on review and appeal.

■ In his brief the employee recognizes the oft-repeated rule that where the facts were in dispute, as they were here, the scope of appellate review in a case of this nature is limited to a determination of whether the findings of the Industrial Commission are supported by competent and substantial evidence upon the whole record, and that the appellate court is not at liberty to substitute its judgment for that of the administrative tribunal unless the findings are clearly contrary to the overwhelming weight of the evidence. Gennari v. Norwood Hills Corporation, Mo., 322 S.W. 2d 718; Lake v. Midwest Packing Co., Mo., 301 S.W.2d 834; Wood v. Wagner Electric Corp., 355 Mo. 670, 197 S.W.2d 647. But he contends that the medical evidence offered by the employer and insurer was insufficient to sustain the award, and that

the testimony of both Dr. George and Dr. Diehr should have been disregarded because they expressly or tacitly conceded that their opinions were influenced by the fact that the hospital record did not make mention of the accident of July 26, 1958.

It is true that on cross-examination Dr. Diehr, who based his opinion on the hospital records, did state that the lack of any reference to an injury had influenced his opinion, but when asked whether his opinion would have been changed if an injury had been referred to in the records he replied that that would depend upon the nature of the injury. Dr. George did not admit, tacitly or otherwise, that his opinion was influenced by the absence of any reference in the hospital records to an injury on July 26; he had examined the employee on August 13, found no evidence of any injury, studied the x-ray reports, and based his opinion on what he observed and what the x-rays revealed.

■■ While the occurrence of any accident and resulting injury were disputed by the employer and insurer, it is obvious from its findings that the Industrial Commission accepted the employee's testimony that he had fallen and skinned his shin, for it found that he sustained an accidental injury. But the vital question then presented was whether the accidental injury so aggravated the employee's pre-existing osteomyelitis as to necessitate the amputation. Such a medical question is one peculiarly for the determination of the Industrial Commission, Gennari v. Norwood Hills Corp., supra; Vollmar v. Board of Jewish Education, Mo., 287 S.W.2d 868, and as to that issue the Commission specifically found that the osteomyelitis was not aggravated by the accident, that the amputation was not the result of or in any way connected with the accident, and that the amputation was the natural result of the progressive destructive process, over a long period of time, of the osteomyelitis. The medical history of the employee's case, and particularly the testimony of Dr.

George, amply supports the Commission's findings.

The judgment should be affirmed, and the Commissioner so recommends.

PER CURIAM.

The foregoing opinion by DOERNER, C., is adopted as the opinion of the court.

Accordingly, judgment is affirmed.

ANDERSON, P. J., and WOLFE, J., concur.

RUDDY, J., not participating.