**Victoria Regina HAYNES and Courtney Allison Haynes, Appellants,**

v.

**EMERSON ELECTRIC COMPANY, Respondent.**

No. 16765.

Missouri Court of Appeals, Southern District, Division One.

Nov. 8, 1990.

Motion for Rehearing and Transfer to Supreme Court Denied Nov. 28, 1990.

Application to Transfer Denied Jan. 9, 1991.

James E. Reeves, Ward & Reeves, Caruthersville, for appellants.

James B. Kennedy, Evans & Dixon, St. Louis, for respondent.

CROW, Judge.

Claimants Victoria Regina Haynes and Courtney Allison Haynes appeal from a final award of the Labor and Industrial Relations Commission ("the Commission") denying compensation under The Workers' Compensation Law, chapter 287, RSMo 1978, as amended. Claimants, the only children of Luther Charles Haynes, sought benefits for his death. Mr. Haynes, an employee of Emerson Electric Company ("Emerson"), died of a heart attack March 28, 1984, while driving an 18–wheel tractor-trailer unit for Emerson.

The Commission, by a 2–1 vote, reversed an award by an administrative law judge ("ALJ") of the Division of Workers' Compensation allowing benefits. The majority of the Commission held claimants failed to establish Mr. Haynes' death "was the result of a job related accident."

The scope of our review is established by § 287.495, RSMo 1986. It provides, insofar as pertinent to this appeal:

"1. ... Upon appeal ... in the absence of fraud, the findings of fact made by the commission within its powers shall be conclusive and binding. The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:

. . . .

(4) That there was not sufficient competent evidence in the record to warrant the making of the award.

. . . ."

We review the Commission's award, not that of the ALJ. *Jordan v. D & L Custom Wood Products*, 767 S.W.2d 378, 380 (Mo. App.1989); *Richardson v. Falcon Products, Inc.*, 739 S.W.2d 596, 597[1] (Mo.App. 1987); *Long v. City of Hannibal*, 670 S.W.2d 567, 569–70[5] (Mo.App.1984). Our duty is to determine from the record as a whole whether the Commission could reasonably have made its findings and award, reviewing the record in the light most favorable to the Commission's findings. *Johnson v. City of Duenweg Fire Dept.*, 735 S.W.2d 364, 366[2] (Mo. banc 1987). The Commission is the sole judge of the weight of the evidence and the credibility of the witnesses. *Welborn v. Southern Equipment Co.*, 395 S.W.2d 119, 125–26[7] (Mo. banc 1965); *Smith v. Ozark Lead Co.*, 741 S.W.2d 802, 812[7] (Mo.App.1987). If the competent evidence or permissible inferences are conflicting the choice rests with the Commission and is binding upon us. *Davis v. Roadway Express, Inc.*, 764 S.W.2d 145, 152 (Mo.App.1989); *Katzenberger v. Gill*, 690 S.W.2d 473, 475[2] (Mo.App. 1985); *Springett v. St. Louis Independent Packing Co.*, 431 S.W.2d 698, 700[6] (Mo. App.1968).

Section 287.120.1, RSMo 1978, provides:

---

"Every employer subject to the provisions of this chapter shall be liable, irrespective of negligence, to furnish compensation under the provisions of this chapter for ... death of the employee by accident arising out of and in the course of his employment...."

Section 287.020.2, RSMo Cum. Supp.1983, provides:

"The word 'accident' as used in this chapter shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen event happening suddenly and violently, with or without human fault, and producing at the time objective symptoms of an injury."

In *Wynn v. Navajo Freight Lines, Inc.,* 654 S.W.2d 87 (Mo. banc 1983), the Commission awarded death benefits to the widow and unemancipated children of a truck driver who suffered a fatal heart attack while driving his usual route. On appeal the Supreme Court of Missouri stated: "The issue in this case is whether an employee's death by work induced heart attack during the continued performance of his usual duties constitutes ground for worker's compensation death benefits." *Id.* at 87–88.

Affirming the award, the Supreme Court of Missouri noted that judicial construction of the statutory definition of "accident" had been broadened in *Wolfgeher v. Wagner Cartage Service, Inc.,* 646 S.W.2d 781 (Mo. banc 1983). *Wynn,* 654 S.W.2d at 89. The opinion in *Wynn* quoted the following passage from *Wolfgeher,* 646 S.W.2d at 784:

"Where the performance of the usual and customary duties of an employee leads to physical breakdown or a change in pathology, the injury is compensable." *Wynn,* 654 S.W.2d at 89.

The opinion in *Wynn* declared that under *Wolfgeher* a work related heart attack during the course of one's employment is compensable even though unaccompanied by unusual or abnormal strain. *Wynn,* 654 S.W.2d at 89. *Wynn* stated:

"Even though [the employee] was in poor health, had a preexisting heart condition, did not take good care of himself, and might have succumbed to a fatal heart attack while off work, possibly caused by different sorts of stress, the right to compensation should exist if the actual triggering causes are found, on the basis of substantial evidence, to meet the 'job related' or 'work related' test of *Wolfgeher.*" *Wynn,* 654 S.W.2d at 89–90.

In *Staab v. Laclede Gas Co.,* 691 S.W.2d 343 (Mo.App.1985), the Eastern District of this Court applied *Wolfgeher* and *Wynn* in affirming the Commission's denial of workers' compensation benefits to the widow of an employee who suffered a fatal heart attack on the job. The Eastern District held an employee's death by heart attack is compensable if it is work induced and occurs during the performance of the employee's usual duties. 691 S.W.2d at 344[1].

In the instant case Mr. Haynes, age 36, and Hiram Jennings Houston drove as a team for Emerson. Their trips originated at a terminal in Kennett and took them "coast to coast." They usually departed Sunday afternoon and returned "late Friday or early Saturday morning." Houston testified, "[Y]ou try to figure out hours that you can drive and keep that truck in operation twenty-four hours a day." He explained, "[Y]ou can drive like ten hours and then you're supposed to take an eight hour break."

The journey during which Mr. Haynes died began Saturday evening, March 24, 1984, when he and Houston departed for Tempe, Arizona, with a cargo of motors. The motors were on pallets. There were between 26 and 30 pallets; each pallet weighed "[p]robably 2,000 pounds or more."

The duo reached Tempe early Monday morning and unloaded approximately half the pallets, using manual pallet jacks to pull the pallets from the trailer into a warehouse. The task, according to Houston, was "fairly strenuous" and required about half an hour.

They then drove to Phoenix, arriving in "less than an hour." There they unloaded the remaining pallets. This took another half hour.

From there they drove to Nogales, Arizona, arriving "sometime before noon." At Nogales some 44,000 pounds of chick peas were loaded on the trailer by the shipper. Neither Houston nor Haynes assisted. They departed Nogales Monday afternoon, Houston driving. Their destination was a cannery "about 50 or 60 miles north of Indianapolis," Indiana.

The tractor was equipped with a "sleeper bunk" which, according to Houston, was "not too comfortable." He explained, "You're bouncing and rolling around in that thing all the time." This interfered with his ability to rest and sleep. The heavier the load, the rougher the ride.

Houston and Haynes alternated driving. Haynes was driving when they reached Springfield, Missouri. There, Houston took over and Haynes got in the sleeper. He remained there until they reached a truck stop at Effingham, Illinois, some seven hours later. Houston did not know whether Haynes slept during that interval.

At Effingham, Haynes complained about a toothache and got "some toothache medicine to put on his tooth." The duo departed Effingham around 2:30 or 2:45 a.m., Wednesday, March 28, 1984, Haynes driving.

Around 6:00 or 6:30 that morning the unit was northbound on Interstate 465 at Indianapolis. Houston, who was in the sleeper, heard the glass "pop out" of the cab and heard Haynes "groan a couple times." Houston opened the curtain and saw Haynes "draped over the steering wheel." The vehicle came to rest upright in a ditch. Haynes was pronounced dead at the scene.

Haynes and Houston had traveled about 3,800 miles since leaving Kennett, each driving approximately half the distance. They had not stopped anywhere to sleep, but had stopped for fuel and meals.

An autopsy was performed on Haynes' body by a forensic pathologist at the Indiana University School of Medicine. Regarding the heart, the autopsy report states: "There is marked arteriosclerotic heart disease which is characterized by numerous atherosclerotic plaques which occlude the lumina as much as 75 to 80%." The cause of death is shown as: "Arteriosclerotic Heart Disease with Acute Myocardial Infarction."

The pathologist did not testify at the ALJ's hearing. Each side did, however, present a medical expert.

Claimants' expert was James Walter Bernard, M.D. He graduated from medical school in 1959 and is certified by the American Board of Family Practice. According to Dr. Bernard, high stress occupations affect a person's chances of a heart attack or heart disease. Stress increases the heart rate, produces arrhythmia in many instances, and in certain conditions can precipitate a fatal heart attack.

Haynes had been a patient at the clinic where Dr. Bernard practices, but Bernard never personally treated Haynes. Dr. Bernard was asked to assume Houston's testimony and the autopsy report were true, and to give his opinion on whether Haynes' death was "related to his job or occupation." Bernard answered, "I think it is related." His testimony continued:

"Q ... in your opinion based on this same information, is the occupation of a truck driver stressful?

A Yes, sir.

Q In your opinion does the stressful condition of that occupation, is that a substantial factor in bringing about the cardiac death of a person suffering from a pre-existing condition of arteriosclerosis such as Mr. Haynes had?

. . . .

[A] I think it would be a precipitant factor.

Q ... Would you explain how and why, Dr. Bernard?

. . . .

A  There are three items that I can recall in [the autopsy report and Houston's testimony].  The first is the description under 'heart' on page three.  The second is the complaint of the toothache and the odds and ends of information following that [in Houston's testimony]. . . .  And third, is the information as to his occupation and working hours and resting accommodations which to me are straight forward. . . .  A rule of thumb—this is concerning the toothache.  A rule of thumb is in any male over 25 or in any female over 40, any unusual pain or distressing pain between the diaphragm and the ears is heart until proven otherwise.  That is a basic.  The second thing, and there are pluses and minuses in the autopsy report that this doesn't tell me, the description in the autopsy report of the location of the infarction, which is heart attack, which means it was anterior which is over the main pumping chamber, the location of this is described but the key thing there is they said, 'there is recent infarction of the anterior myocardium with focal depressed hemorrhagic areas scattered over an area including the anterior papillary muscle'.  So what the meat of my comment is, is that it takes time for the body to react in any manner to an injury and start sending cells in and doing the repair work that it does.  If you die instantly you don't see this.  And so to me this sentence means that he had his actual injury, the occlusion of the vessel, or at least the injury to the muscle in that area sometime prior to the time he collapsed over the wheel.  And I'm just guessing and there is no way for me to know.  I'm not a forensic pathologist.

. . . .

Q  Doctor, is it a well recognized medical fact now that stress is a substantial contributing factor to heart attacks or coronary deaths?

. . . .

A  The answer has two parts.  It is well recognized that stress is a precipitant factor in the occurrence of abnormal rhythms, and that the abnormal rhythms are usually what are the terminal events in most people with heart attacks who are of a relatively young age, meaning 60 or less.  The second part of that question is that in the medical literature there is important discussion as to the relevancy of stress and Type A personality, and many people believe, I being one, that on-going stress is a dominate [sic] factor in the development of coronary disease.

Q  Based upon ... Houston's [testimony], in your opinion was Charles Haynes undergoing stress while he was out on the road driving his eighteen wheeler?

A  Yes, sir."

On cross-examination by Emerson's lawyer, Dr. Bernard conceded he is not a specialist in cardiology.  He explained that "heart attack is laymen's terminology for myocardial infarction."  Cross-examination continued:

"Q  And myocardial infarction simply describes blockage of a vessel which results in death; correct?

A  Yes.  Blockage being by spasm or by something physical there.

. . . .

Q  Many, many individuals die sudden cardiac deaths who are engaged in no stressful, physically or emotional stressful situations at all; true?

A  As far as we know.

. . . .

Q  Now, this man had arteriosclerotic heart disease; isn't that true?

A  Yes.

Q  There is no doubt that he had some impairment in the circulation of his coronary arteries based upon that autopsy report; true?

A  Right.

. . . .

Q  And such individuals with arteriosclerotic heart disease at some point may

well just spontaneously die as a result of cardiac accident.

A   True.

Q   And that is just a natural result of the disease process of arteriosclerotic heart disease that those vessels become so occluded that an accident occurs such as a blockage of a vessel occurs and they die; true?

A   Yes, sir.

Q   And in this case Luther Haynes could simply have been the victim of a heart attack which was simply the end result of an on-going cardiac disease process; true?

A   Yes, sir.  He had a heart attack as a result of the multiplicity of things that had gone on before.

. . . .

Q   ... Doctor, in light of previous symptoms, his cardiac disease and the fact that no one really knows how much stress he was under, you cannot testify with medical certainty that the heart attack resulted from stress on that date that he died versus simply being the end product of progressive heart disease; is that true?

A   I think that's true.

. . . .

Q   Doctor, in light again of this man's pre-existing arteriosclerotic heart disease, it is a possibility that he was having symptoms prior to even his employment at Emerson of arteriosclerotic heart disease, and again assuming the necessity of having to speculate insofar as how much stress he may or may not have been under within a few minutes or hours of his death, isn't it a fact that you cannot state with medical probability that his death was related to employment stress versus simply again being an inevitable result of progressive coronary artery disease?

. . . .

[A]   I have an opinion that it is related, meaning that his death is related to the events of that day.

Q   ... Doctor, a probability.  Not certainty, but probability.  But in order to reach that conclusion you have to speculate insofar as determining the amount of stress that he was in fact under at the moment of his heart attack;  true?

. . . .

[A]   I would have to speculate as to what actually transpired, yes."

Emerson's medical expert was John D. Davidson, M.D., a 1952 medical school graduate and specialist in internal medicine and cardiology.  Dr. Davidson, like Dr. Bernard, had never examined or treated Mr. Haynes.  Dr. Davidson had, however, reviewed various medical records pertaining to Haynes, together with the autopsy report.

Emerson's lawyer propounded a lengthy question to Dr. Davidson, hypothesizing the events commencing March 24, 1984, and culminating in Haynes' death.  The doctor was asked whether he had an opinion, "within a reasonable degree of medical certainty, as to the cause of Mr. Haynes' death on March 28th, 1984?"  Dr. Davidson responded, "My opinion is that this gentleman's death was due to acute myocardial infarction in a man with longstanding arteriosclerotic coronary artery disease."  The testimony continued:

"Q   And Doctor, again assuming all of those hypothetical facts and the records reviewed, were you able to reach an opinion, within a reasonable degree of medical certainty, as to whether or not there was any medical causal relationship between this gentleman's occupation of being a truck driver or occupational duties involved therein and his death of 3/28/84?

A   Yes.

Q   And what is that opinion, Doctor?

A   My opinion is that there is no relationship between his occupation as a truck driver and his death."

On cross-examination by claimants' lawyer, Dr. Davidson stated Haynes had se-

vere generalized arteriosclerotic disease that had been "[t]wenty years in the development." Asked what he would have done had Haynes come to him a few weeks before his death, Dr. Davidson testified:

"In a man like that I would have done a coronary arteriogram on him, which would have documented the extensive disease, and depending on its pattern, I would have probably recommended a coronary artery bypass graft to be done. I would have come down on him with both feet about his smoking and about his obesity and about his diet and other things such as that. I probably would have put him on platelet anti-coagulating drugs.

Q What about his job-related activities?

A I probably wouldn't have changed those any. As a matter of fact, I probably would have increased his physical activity considerably above what he does.

. . . .

Q Does the stress play any role in the onset or the immediate cause of a—

A 'Stress' is a terrible word. It probably should never be used in depositions. It merely means that a set of physiologic circumstances within an individual who is unable to cope with his life situation at that moment. Therefore, if you—I think that rather than use such an amorphous, meaningless word you have to say what do you mean by that. As I've said, most people use stress just by taking something and saying there is something out there that's causing me trouble, when in reality the patient is the cause of the trouble.

Q All right. Let me define what I mean by stress. I'll ask you to assume that this truck driver was on the road long hours. He didn't get much sleep. He lost a lot of sleep. He took caffeine just to stay awake. He worked longer hours than he was supposed to by the rules. He complained of being fatigued, and he was required to be out at times as long as five to six days, and he slept in just a little cab in the back of a truck, and that he was—when he would come in off of these trips he would be very fatigued. Now, using stress in that sense, the immediate stress of fatigue and long hours, does that have any effect upon the onset of coronary heart attack?

. . . .

A ... The question is: Would fatigue, working long hours at one's job, is that a contributing factor to the acute myocardial infarction? The answer is: No. There is no evidence of that in the literature. Acute myocardial infarction, which is caused by a thrombus within a blood vessel that is already damaged by arteriosclerosis, occurs around the clock with fairly even frequency around the clock, whether people are working, whether they are sound asleep, whether they are at home and so forth, whether they are doing things they like to do or don't do. There is essentially no relationship with acute physical activity and there is no—

Q I'm not asking about physical activity. I was talking about lack of sleep and fatigue.

A And there is no relationship with that.

Q All right. Is there any data or criteria that you are aware of which you can relate the cause, the immedi- [sic] cause of acute myocardial infarction?

A The question you are asking is: What is the initiating event that initiates the cause of the clot or the thrombus formation in a blood vessel that is already narrowed by arteriosclerosis? The answer to that is it is not known. What is known is that there are many, many things that are not related to it. The things that you've just mentioned are not related to it.

Q All right. Well, what is related to it?

A Basically the vast majority of acute myocardial infarctions are spontaneous events in the history of the life of

chronic arteriosclerotic coronary artery disease. And as I've said, this occurs with certain patterns around the 24–hour period unrelated to physical activity, unrelated to emotional stress. It occurs while sound asleep in bed or while you are at work or while you are at the ball game. There are two peaks of increased onset of myocardial infarction around the 24–hour period: One early in the day from about 6:00 till 9:00 in the morning, another peak about 4:00 to 5:00 in the afternoon or a little bit later. The reason for this is not known, and this is a generalized phenomenon in arteriosclerotic disease in this country.

Q Well, is there any evidence that there is any immediate cause of it?

A No."

The ALJ found:

"Claimants' medical evidence was conjectural and failed to establish a precise event sufficient to cause employee's death, but I find the exertion required to drive a tractor-trailer, eighteen wheeler created a natural triggering cause between employee's work and his death.

[Emerson's] medical evidence was also based on abstractions which failed to establish with reasonable medical certainty that employee's death was not caused by his work activity. Dr. Richardson's assertion that heart attacks may occur at any time without respect to stress, exertion or strain does not negate claimants' proof of a job related death.

I therefore find (1) employee sustained an injury by accident resulting in his death on March 28, 1984; (2) that employee's death on said date arose out of and in the course of his employment with Emerson ...; and (3) there existed a causal relationship between the accident and employee's death."

Emerson filed an application for review by the Commission, arguing the ALJ erred

in ruling (a) Haynes sustained an injury by accident, (b) Haynes' death arose out of and in the course of his employment, and (c) there was a medical causal connection between the "accident" and Haynes' death.

The findings in the final award denying compensation adopted by a majority of the Commission [1] include these:

"In the instant case, the best Dr. Bernard could say with respect to the cause of the employee's death is that it probably was job related and that was based on speculation. This testimony, together with the doctor's admission that people such as the deceased who have arteriosclerotic heart disease may die spontaneously as the natural end result of the disease, does little to persuade us that the employee's death was the result of a job related accident.

Additionally, the medical testimony presented by Dr. Davidson, a specialist in the field, further creates doubts that the employee's death was the result of a work related accident. As in [*Hutchinson v. Tri–State Motor Transit Co.*, 721 S.W.2d 158 (Mo.App.1986)], we are faced with conflicting medical theories and we find Dr. Davidson's testimony to be more credible and worthy of belief....

... the Commission finds that the award of the [ALJ] in this case must be reversed, and no compensation awarded in that the claimants have failed to establish that the injury was the result of a job related accident, and have further failed to establish a casual [sic] connection between the injury and the accident."

Claimants' brief presents one point relied on. It begins:

"The ... Commission's order by divided Commission (2–1) denying compensation should be reversed and remanded to the Commission with directions to enter an order reinstating the award of com-

**1.** Claimants' brief states the case was orally argued before the Commission June 2, 1987. The Commission's award is dated December 14, 1989. The record yields no clue to the reason for the 30–month delay between argument and award.

pensation by the [ALJ] because there was not sufficient competent evidence in the record as a whole to warrant the Commission denying compensation and finding no 'accident', and is clearly contrary to the overwhelming weight of the evidence in that the heart attack was job related and, hence, an 'accident' in that ..." [2]

This is followed by four sub-points denominated "A" to "D." We address them in the order presented.

■ Sub-point A asserts Dr. Davidson's testimony that there was no relationship between Mr. Haynes' occupation as a truck driver and his death was not substantial evidence because the hypothetical question posed by Emerson's lawyer omitted "any reference to job stress and the stressful factors of a truck driver aboard an eighteen wheeler over the road twenty-four hours a day for about eighty-four hours."

The thrust of this contention, as we fathom it, is that Dr. Davidson's testimony did not constitute substantial evidence on which the Commission could base its finding that Mr. Haynes' death was not the result of a job-related accident. The argument assumes the Commission could deny benefits only if there was affirmative evidence that Haynes' heart attack was not work-induced.

We disagree. It was claimants' burden to prove all material elements of their claim. *Meilves v. Morris*, 422 S.W.2d 335, 339[5] (Mo.1968). One seeking workers' compensation benefits must produce evidence from which it reasonably may be found that the injury resulted from a cause for which the employer would be liable. *Griggs v. A.B. Chance Co.*, 503 S.W.2d 697, 704[6] (Mo.App.1973); *Groce v. Pyle*, 315 S.W.2d 482, 489[3] (Mo.App.1958).

As we understand *Wynn*, 654 S.W.2d 87, and *Staab*, 691 S.W.2d 343, a heart attack suffered by an employee while performing the duties of his employment constitutes an accident arising out of and in the course of his employment (§ 287.120.1) only if the performance of the duties induces the heart attack. Accordingly, it was incumbent on claimants to present evidence convincing the Commission that Mr. Haynes' heart attack was "job related" or "work related" within the meaning of *Wynn*, 654 S.W.2d at 89–90.

Claimants' only medical evidence on that issue was the opinion testimony of Dr. Bernard. The Commission was not obliged to believe Dr. Bernard's opinion was correct. The Commission is charged with the responsibility of passing upon the credibility of witnesses, and it may disbelieve testimony of a witness though no contradictory or impeaching evidence is introduced. *Page v. Green*, 686 S.W.2d 528, 530[3] (Mo.App. 1985); *Blissenbach v. General Motors Assembly Div.*, 650 S.W.2d 8, 11[5] (Mo.App. 1983). Emerson was not required to present substantial evidence that Mr. Haynes' heart attack was not job-induced.

■ Irrespective of that, however, the hypothetical question is not vulnerable to the attack lodged by claimants. The question hypothesized the time consumed and route driven during the fatal journey, the manual unloading of the motors at Tempe and Phoenix, the eight-hour driving shifts, the failure to stop anywhere for sleep, and Houston's testimony that they had driven in rain en route to Indianapolis. The failure of the question to hypothesize that the sleeper bunk was uncomfortable and that truck driving is a strenuous job because the driver constantly faces traffic did not disqualify Dr. Davidson's answer as substantial evidence. *Gavan v. H.D. Tousley Co.*, 395 S.W.2d 266, 270[7] (Mo.App.1965). Sub-point A is without merit.

■ Sub-point B argues Dr. Davidson's testimony was not substantial evidence because he completely rejected the concept

---

**2.** The point does not appear this way in claimants' brief. However, claimants moved to amend the point to read as set forth above. The motion was taken with the case. We grant the motion.

that job stress can be an initiating or "triggering" cause of a heart attack. Claimants maintain Dr. Davidson's opinion is "contrary to well settled law in Missouri that such stress can be an initiating or triggering event," and therefore is entitled to no weight. Claimants assert the Supreme Court of Missouri recognized in *Wynn* "that a fatal heart attack of a truck driver which was triggered by stress is sufficient to award compensation even though the employee might have succumbed to a fatal heart attack while off work possibly caused by different sources of stress."

Sub-point B, like sub-point A, assumes the Commission could deny benefits only if there was affirmative evidence that Mr. Haynes' heart attack was not work-induced. What we said about that in discussing sub-point A applies equally to sub-point B.

More importantly, however, sub-point B supplies no basis for automatically branding Dr. Davidson's testimony worthless. As we read Dr. Davidson's testimony, he used the word "stress" to characterize the "physiologic circumstances" within an individual unable to cope with his immediate situation. When claimants' lawyer refined the question by asking whether driving a tractor-trailer unit long hours without adequate sleep five to six days in a row would enhance the driver's chances of a heart attack, Dr. Davidson answered no. He added that heart attacks occur whether people are working or asleep and whether they are doing things they enjoy or dislike.

Dr. Davidson was qualified by education and experience to express his opinion—and the reasons for it—on whether Mr. Haynes' heart attack was job-related. The weight to be given Dr. Davidson's opinion was for the Commission to determine. In doing so the Commission could consider all of Dr. Davidson's testimony, including that emphasized by claimants. While claimants may scoff at Dr. Davidson's testimony, they cite no authority supporting their thesis that it was entitled to no weight as a matter of law. Sub-point B is denied.

Sub-point C avers the Commission arbitrarily and irrationally accepted Dr. Davidson's opinion that heart attacks are not stress or job related but rejected substantially the same testimony from him in *Low v. ACF Industries*, 772 S.W.2d 904 (Mo.App.1989). In *Low* an employee suffered a non-fatal heart attack, and the Commission awarded workers' compensation benefits for permanent partial disability. The employee narrated a history of "chest flutterings," the frequency of which increased while he was at work and decreased at night or during periods when he was off work. The employee's medical expert testified that during a period of severe occupational stress the employee had arrhythmias of the heart manifested by fluttering in the chest, and these were treated by having him withdraw from work, whereupon they were observed to resolve. Asked if he had an opinion based on reasonable medical certainty as to whether the arrhythmias were directly and proximately caused by the stress associated with the employee's job during a seven-month period, the expert answered that the arrhythmias were induced by the conditions of the job.

Dr. Davidson, testifying for the employer in *Low*, acknowledged that, assuming the employee's history of coronary heart disease, emotional stress can be a precipitating cause of dysrhythmias. He further conceded that the fact there was some improvement during absence from work suggested that the stress of the employment situation either aggravated or precipitated the dysrhythmias. It was Dr. Davidson's opinion, however, that the employee's problems were due to an underlying heart disease and completely unrelated to his job.

Affirming the award of benefits in *Low*, the Eastern District of this Court noted that where the right to compensation depends upon the acceptance of one of two conflicting medical theories, the issue is one of fact for determination by the Commission. 772 S.W.2d at 906[3].

The evidence in *Low* differed from that in the instant case. In *Low* there was

evidence the employee was under stress because his employer told him he was not producing and he would be let go if he did not straighten out. Fellow employees performing like duties were being laid off. The employee's symptoms increased at work and diminished away from work. His medical expert's opinion, based on reasonable medical certainty, was that the arrhythmias were induced by the conditions of the employee's job.

In the instant case Mr. Haynes and Houston had driven together six weeks immediately before Haynes' death. During that time Houston heard Haynes complain only of the toothache and being tired once or twice. Asked whether Haynes ever complained "of any type of stress that he was under for any reason," Houston replied, "No, he didn't say anything to me about any of his pains or aches." Asked whether Haynes ever expressed an attitude about his job, Houston answered, "He liked it, he liked the job, and he told me he liked running with me."

*Low* also differs from the instant case in that the employee's medical expert was not Dr. Bernard.

Claimants are therefore incorrect in saying the only difference between *Low* and the instant case is that the Commission accepted Dr. Davidson's opinion in the former but rejected substantially the same testimony in the latter. Sub-point C is without merit.

Sub-point D states the Commission improperly rejected Dr. Bernard's testimony as "speculation" by requiring "medical certainty" rather than the proper medical standard, "probability."

Claimants base this contention on the following passage from the Commission's award:

"Although it was [Dr. Bernard's] opinion that job related stress caused Haynes' death, that opinion was based on speculation regarding whether Haynes was experiencing stress related to his work. Since it was also possible that Haynes

death was the result of progressive heart disease, the doctor's opinion was not based on 'medical certainty' but rather was a 'probability'."

Claimants cite *Johnson*, 735 S.W.2d 364, where the issues were whether a volunteer firefighter suffered a heart attack while fighting a fire during intense summer heat and whether the stress of fighting the fire caused the heart attack. The firefighter's medical expert could not state with reasonable medical certainty that the firefighter suffered a heart attack that day. However, the expert did testify he could not exclude that the firefighter did not have a myocardial infarction at that time, and that it probably would not have occurred at that time if the firefighter had not been under such stress. The employer and insurer argued that the expert could not be absolutely certain the firefighter had suffered a heart attack while fighting the fire, therefore the causal relationship was not established. *Id.* at 366.

The Supreme Court of Missouri in *Johnson* held the evidence sufficient to support an award of workers' compensation benefits. The Court said:

" ... in this case the Commission reasonably concluded from the evidence that the [firefighter's] pre-existing heart condition was activated by the unusual exertion on the job. Before the incident on [the date of the fire], the [firefighter] had not complained of pain in his chest or arms. The pain [which commenced while fighting the fire] lasted from one to one-and-one-half hours, the average time normally associated with a heart attack. The [firefighter] continued to complain of tiredness and additional pain until [a] subsequent heart attack...." *Id.* at 367.

In the instant case claimants maintain that by requiring "medical certainty" the Commission violated the ruling in *Johnson*. Claimants assert they were required to show only a probability that Mr. Haynes' heart attack was job-related. Claimants direct us to the following passage from

*Ellis v. Western Elec. Co.*, 664 S.W.2d 639, 642[4] (Mo.App.1984), a workers' compensation case:

"Claimant did not have to absolutely establish the essential elements of her case; it is sufficient if she shows them by a reasonable probability. [Citation omitted.] 'Probable' means that it appears to be founded in reason and experience which inclines the mind to believe, but leaves room for doubt."

We do not believe the Commission, in the passage from its award seized upon by claimants, applied the wrong standard of proof. Instead, we view the passage as a comment on the strength of Dr. Bernard's opinion weighed against Dr. Davidson's opinion. As Emerson points out, Dr. Bernard conceded that working nine hours does not automatically result in stress and he would have to speculate on the amount of stress Mr. Haynes was under at the moment of his heart attack.

■ Reading the Commission's award in its entirety, we do not understand it to say that for claimants to recover they had to establish to a medical certainty that Mr. Haynes' heart attack was job-related.

In sum, the instant case presents a close medical issue on which two qualified experts held conflicting opinions. To illustrate this we have quoted extensively—perhaps too extensively—from each expert's testimony. As observed in *Hutchinson v. Tri–State Motor Transit Co.*, 721 S.W.2d 158, 162[4] (Mo.App.1986)—a workers' compensation case in which an over-the-road truck driver suffered a fatal heart attack and this Court affirmed the Commission's denial of benefits:

"A finding of the commission consistent with either of two conflicting medical opinions will be upheld by this court if supported by competent and substantial evidence upon the whole record."

Claimants in the instant case have presented strong arguments why their medical evidence was more persuasive than Emerson's. That, however, was for the Commission to decide. We may not substitute our own judgment on the evidence for that of the Commission. *Michler v. Krey Packing Co.*, 363 Mo. 707, 253 S.W.2d 136, 141[6] (banc 1952); *Fowler v. Monarch Plastics*, 684 S.W.2d 429, 430[1] (Mo.App. 1984).

Sub-point D is denied and the final award of the Commission denying compensation is affirmed.

MAUS, P.J., and PREWITT, J., concur.