Floyd WILSON, Appellant,

v.

ANR FREIGHT SYSTEMS,
INC., Respondent.

No. WD 48474.

Missouri Court of Appeals,
Western District.

Dec. 6, 1994.

As Modified Jan. 26, 1995.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Jan. 31, 1995.

VanWormer has not been served and has not filed a responsive pleading herein.

James Bell, Kansas City, for appellant.

Hollis Hanover, Kansas City, for respondent.

Before HANNA, P.J., and
BRECKENRIDGE and ELLIS, JJ.

HANNA, Presiding Judge.

The claimant, Floyd Wilson, appeals the decision of the Labor and Industrial Relations Commission (Commission), which found that he was not entitled to receive workers' compensation benefits for an acute myocardial infarction suffered while he was working. The claimant argues that the Commission's decision was not based on competent and substantial evidence, and was against the weight of the evidence. He further asks this court to consider two articles published in *The New England Journal of Medicine* as newly discovered evidence.

On July 25, 1990, claimant, employed by ANR Freight Systems, went to the Hillyard Chemical Company in St. Joseph, Missouri, to pick up a load of freight, weighing approximately 13,000 pounds. Since Hillyard was a new customer, claimant wanted to finish the job quickly in order to make a good first impression. The ambient temperature was 85 degrees, and claimant estimated that it was about 30 degrees hotter inside the truck.

While loading the freight, the claimant began to experience angina-type pain, with associated jaw and chest discomfort. He finished loading the truck and went to his next destination. When his symptoms did not improve, he went to Heartland East Hospital in St. Joseph, where he was admitted and treated by Dr. Stanley Crie. As part of his medical history, claimant told the doctor at the Heartland East Hospital that the day before he had experienced jaw discomfort. Two days later, claimant was transferred to North Kansas City Hospital, where he was under the care of Dr. John Miller.

There is no dispute that the claimant suffered an acute myocardial infarction. The issue litigated at trial was whether the claimant's heart attack was causally connected to his work related activities on that day. The ALJ made the following finding, which was adopted by the Commission:

I find after careful review of all the evidence and testimony provided that the myocardial infarction which the claimant suffered on July 25, 1990, was not triggered, induced or precipitated by the claimant's work activities of July 25, 1990, and therefore not compensable under the Missouri Workers' Compensation Act. I make this finding after careful consideration of all the medical expert testimony regarding causation of heart attacks and also in light of the current status of the Missouri Law on their compensability.

In his first three points, the claimant argues that the Commission's decision is not supported by substantial and competent evidence. He complains that the testimony of expert witnesses Bell and Crie amounted to incompetent evidence, and argues that the findings of fact and the award are "based on suspicion and conjecture."

When reviewing the decision of the Commission, we examine the evidence in the light most favorable to the findings of the Commission and its decision, accepting all reasonable inferences therefrom and disregarding all unfavorable evidence. *Reves v. Kindell's Mercantile Co., Inc.,* 793 S.W.2d 917, 919 (Mo.App.1990). The Commission's decision may be set aside only if there is no substantial evidence to support it or if it is clearly contrary to the overwhelming weight of the evidence. *Jones v. Jefferson City Sch. Dist.,* 801 S.W.2d 486, 488 (Mo.App.1990). We will not substitute our judgment for that of the Commission, even if we would have made a different initial conclusion. *Lawson v. Emerson Elec. Co.,* 833 S.W.2d 467, 471 (Mo.App.1992). The Commission is the sole

judge of witness credibility and the weight and value of the evidence. *Id.* at 470–71.

The issue in dispute in this case was causation. The Missouri Supreme Court, in *Wynn v. Navajo Freight Lines, Inc.*, 654 S.W.2d 87 (Mo. banc 1983), set out the standard by which heart attack cases are deemed to be compensable in Missouri:

> [T]he right to compensation should exist if the actual triggering causes are found, on the basis of substantial evidence, to meet the "job related" or "work related" test of *Wolfgeher.*

*Id.* at 89–90 (*citing Wolfgeher v. Wagner Cartage Serv., Inc.*, 646 S.W.2d 781 (Mo. banc 1983)). Expert medical testimony was provided by three board certified cardiologists. All three physicians agreed that the claimant's medical history contained several factors which placed him in a high risk category for a heart attack. These include: (1) hypertension; (2) high cholesterol; (3) smoking a pack a day for thirty years; and (4) a family history of heart disease, including a father who died of a heart attack at age 49. The evidence is undisputed that these factors contributed to his heart attack.

The evidence was conflicting, however, with regard to whether heavy physical exertion triggered or precipitated the claimant's myocardial infarction. Dr. John Miller, the claimant's treating physician in North Kansas City, testified that it was his opinion that the claimant's strenuous work activities on July 25, 1990, triggered his heart attack. The claimant also questioned expert witnesses, Drs. Bell and Crie, about several articles from medical treatises which stated that heavy physical exertion may induce myocardial infarctions.

Dr. Hubert Bell testified for the employer that the work performed by claimant was not a precipitating factor. Acknowledging that heavy physical exertion may, on occasion, cause heart attacks, he testified that he did not believe this to be the case with claimant. Dr. Bell stated that the angina-like jaw pain experienced by the claimant the day before his myocardial infarction made it more likely that the claimant's heart attack was caused by a blood clot which had formed over time.

Dr. Stanley Crie, who was the claimant's treating physician during the critical first two days at Heartland East Hospital, testified that although some experts in the field do believe that, on occasion, strenuous physical activities may cause myocardial infarctions, most people who have myocardial infarctions have them without physical exertion. Dr. Crie stated that he could not say, to a reasonable degree of medical certainty, whether or not a cause and effect relationship existed between the claimant's physical exertion and his heart attack. However, citing the jaw pain, indicative of angina, experienced by the claimant the day before his heart attack, it was his opinion that the work conditions did not cause the attack.

Both Drs. Bell and Crie testified on cross examination concerning three articles in medical treatises which linked heavy physical exertion and myocardial infarctions. Regarding Braunwald's textbook, *Heart Disease*, the doctors agreed with the text which stated that 13% of heart attack victims were engaged in heavy physical exertion at the onset of the infarction. The article continued to say that there is suggestive evidence that heavy exercise may play a precipitating role in some patients. Another textbook, *The Heart*, used during the doctors' cross-examination, states that a single episode of physical stress in individuals prone to heart attacks may trigger infarctions. It further stated that the shorter the time interval between the exercise and the myocardial infarction, the more likely there is a causal relationship. Finally, Dr. Crie testified from an article in *The American Journal of Cardiology* that the most commonly reported possible triggers of myocardial infarction were emotional upset and physical activity, and that physical activity may predispose to plaque rupture and coronary occlusion, causing myocardial infarction. Dr. Crie testified that he interpreted the articles as saying that there may be occasions when unusual physical exertion could precipitate or cause a myocardial infarction, but in general that is not the case.

█ The claimant dedicates much of his brief to attacking the testimony of Drs. Bell and Crie, in an attempt to discredit their medical opinions. The thrust of his argu-

ment is that the testimony of Drs. Bell and Crie did not constitute substantial evidence on which the Commission could base its finding that the claimant's heart attack was not work related. It is possible to argue discrepancies in their testimony but we have carefully reviewed all of the testimony and specifically the medical testimony and conclude that the opinions of Drs. Bell and Crie were based on substantial evidence.

 It is the claimant's burden to prove all material elements of his claim. *Haynes v. Emerson Elec. Co.*, 799 S.W.2d 939, 947 (Mo. App.1990). In order to prevail, the claimant was required to present evidence to convince the Commission that his heart attack was "job related" or "work related" within the meaning of *Wynn*. *Id.* The employer, ANR Freight, was not required to present substantial evidence that claimant's heart attack was not job-induced. *Id.* The Commission chose not to believe Dr. Miller's testimony in weighing all of the evidence and evaluating the credibility of the witnesses.

 The claimant presented, as evidence of causation, the testimony of Dr. Miller that his heart attack was work-induced, and several articles from medical treatises which stated that heavy physical exertion may precipitate myocardial infarctions. The Commission, however, was not required to believe that this evidence established causation, even if no contradictory or impeaching evidence is introduced. *Page v. Green*, 686 S.W.2d 528, 530 (Mo.App.1985). The court of appeals must disregard any evidence which might support a finding different from that of the Commission, even though a finding to the contrary would have been supported by the evidence. *Stockman v. J.C. Indus., Inc.*, 854 S.W.2d 24, 26 (Mo.App.1993).

 The facts of this case presented a difficult medical question on which qualified experts held conflicting opinions. "[W]here the right to compensation depends upon the acceptance of one of two conflicting medical theories, the issue is one of fact for determination by the Commission." *Haynes*, 799 S.W.2d at 948 (*citing Low v. ACF Indus.*, 772 S.W.2d 904, 906 (Mo.App.1989)). The Commission did not believe that the claimant

proved causation, and that was for the Commission to decide.

In his final point, the claimant asks this court "for its equitable interference with the Commission's finding ... on account of newly discovered evidence published in the December 2, 1993 issue of *The New England Journal of Medicine*." The evidence consists of two articles entitled, "Triggering of Acute Myocardial Infarction by Heavy Physical Exertion," and "Physical Exertion as a Trigger of Acute Myocardial Infarction." These articles were not presented to the ALJ or to the Commission and are first proffered in this court as "newly discovered evidence."

 The general rule is that presentment of evidence extraneous to the trial court record should not be considered on appeal. *Crestwood Commons Redevelopment Corp. v. 66 Drive-In, Inc.*, 812 S.W.2d 903, 909 (Mo.App.1991). Appellate court review is structured by the statutes. In a workers' compensation review, § 287.495.1, RSMo 1986, states in part as follows:

Upon appeal no additional evidence shall be heard and, in the absence of fraud, the findings of fact made by the commission within its powers shall be conclusive and binding. The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and *no other:*

(1) That the commission acted without or in excess of its powers;

(2) That the award was procured by fraud;

(3) That the facts found by the commission do not support the award;

(4) That there was not sufficient competent evidence in the record to warrant the making of the award.

(Emphasis added). Although the act should be liberally construed in favor of the employee, to secure its benefits to the greatest number, procedures outlined for appeal by this section are mandatory. *Knuckles v. Apex Indus., Inc.*, 762 S.W.2d 542, 543 (Mo. App.1988). Absent ambiguities in the statute, strict compliance with the requirements of the workers' compensation law relating to review and appeal are jurisdictional.

*Abrams v. Ohio Pac. Express,* 819 S.W.2d 338, 342 (Mo. banc 1991). *Abrams* involved the construction of an ambiguity in the statute concerning the time of posting of an application for review which had been imprinted by a postage meter, and the meaning of the word "endorsed." In our case, the words of § 287.495 are plain and clear and leave no room for construction. They admit to but one meaning. *See State ex rel. Missouri State Bd. of Registration for the Healing Arts v. Southworth,* 704 S.W.2d 219, 224 (Mo. banc 1986). While *Abrams* addresses the timing provisions of § 287.480, RSMo. 1986, dealing with the procedure to be followed when appealing a decision of an ALJ to the Commission, the same principle applies when a party appeals the decision of the Commission to the circuit court, § 287.490, and to the appellate court, § 287.495. When no ambiguity exists, there is no need to resort to rules of construction and the statute requires strict compliance. *Abrams,* 819 S.W.2d at 340.

▪ The scope of appellate review of a workers' compensation case is limited to the four grounds specified in the statute. *Katzenberger v. Gill,* 690 S.W.2d 473, 475 (Mo. App.1985). Our jurisdiction is derived from § 287.495, which does not provide for a disposition and remand on the basis of newly discovered evidence which is presented in the first instance to this court. It clearly defines our review to the four grounds set forth, and "no other" grounds. There exists no authority for an appellate court to consider newly discovered evidence first presented on appeal.

Nevertheless, our case law has dealt with the subject. There are only three cases in Missouri which our research has discovered that have allowed "newly discovered evidence" to be considered when the matter was first presented to the appellate court. All three cases were criminal matters and in two of the cases, the newly discovered evidence completely exonerated the defendant who had been convicted. In *State v. Mooney,* 670 S.W.2d 510 (Mo.App.1984), the only witness

to support the defendant's conviction of molestation was a "troubled youth" who, after the time for the filing of a motion for new trial, was taped admitting that he lied under oath at the defendant's trial and made up his testimony. The court in *Mooney* relied upon *State v. Harris,* 428 S.W.2d 497 (Mo.1968), which held that "where it appears from competent and satisfying evidence that a witness for the prosecution has deliberately perjured himself and that without his testimony [the] accused would not have been convicted, a new trial will be granted." *Id.* at 501. In *State v. Williams,* 673 S.W.2d 847 (Mo.App. 1984), both the Prosecuting Attorney of St. Louis County and the Missouri Attorney General agreed that jurisdiction should be returned to the trial court for the purpose of conducting a hearing on a motion for new trial based upon newly discovered evidence. *id.* at 848. The third case, *State v. Post,* 804 S.W.2d 862 (Mo.App.1991), involved newly discovered evidence of juror misconduct. The defendant was convicted of murder in the first degree and sentenced to life imprisonment without eligibility for parole. While the appeal was pending, the defendant filed a motion to remand for a new trial because of the activities of at least five deputy sheriffs not assigned to the case who visited with the sequestered jury in their hotel rooms. The deputy sheriffs engaged in card-playing, beer-drinking, and casual conversation with and in front of the jurors about the case, and one deputy had sexual relations with a juror. The court found the law enforcement officers' conduct outrageous and held that the jury was denied the opportunity and ability to act as a sequestered jury so that they were distracted from "due and fair consideration of the facts." *Id.* at 863.

Those extraordinary circumstances do not exist here. There is no basis for our review of this claimed error.

▪ Although not necessary to the disposition of this issue, even if the newly discovered evidence had been presented after trial to the ALJ or Commission,[1] it would fail

---

1. The Commission has authority to hear newly discovered evidence and its decision whether or not to hear additional evidence under § 287.480,

RSMo 1986, is discretionary. Had the claimant presented the newly discovered evidence to the Commission, its decision would be subject only

because the evidence is cumulative and is evidence which is designed to test the witnesses' knowledge and credibility. In this more traditional situation, the cases are replete with admonitions that motions for new trial on grounds of newly discovered evidence are not favorites of the law. *Williams v. McCoy*, 854 S.W.2d 545, 554 (Mo.App.1993). Courts should grant such motions only in exceptional circumstances. *Id.*

■ A party seeking a new trial on the ground of newly discovered evidence presented in the first incidence to the ALJ or the Commission must show the following: (1) the evidence came to the movant's knowledge since the trial; (2) due diligence would not have uncovered the evidence sooner; (3) the new evidence is so material it would probably have produced a different result had it been presented at trial; (4) the new evidence is not merely cumulative of evidence already presented; and (5) the evidence is not offered to impeach the character or credibility of a witness. *Id.* (*citing Young v. St. Louis Public Serv. Co.*, 326 S.W.2d 107, 111 (Mo. 1959)).

The journal articles advanced by the claimant meet the first two requirements. The articles were not published in the *New England Journal of Medicine* until December 2, 1993, approximately three months following the Commission's decision. There is substantial doubt as to whether the claimant has satisfied the third requirement. However, we address only the fourth and fifth elements.

■ The fourth element requires that the new evidence must not be cumulative of evidence presented at trial. The articles here are cumulative to evidence considered by the Commission. Dr. Miller testified that about 50% of myocardial infarctions were causally related to physical exertion, while 50% were not. Additionally, Dr. Crie testified from several articles printed in authoritative medi-

cal studies which linked heart attacks to physical exertion that most experts in the field believed that heavy exertion could, on occasion, cause heart attacks. In particular, he testified that one study, published in *The American Journal of Cardiology,* showed that the most commonly reported triggers of myocardial infarction patients were emotional upset and physical activity.[2] In the final analysis, the studies all come to the same conclusion—that there appears to be a causative link between physical exertion and heart attacks. The new evidence may be more authoritative, but that confirms our holding that it is cumulative.

■ The final requirement states that the object of the evidence must not be to impeach the character or credibility of a witness. The articles in *The New England Journal of Medicine* are hearsay. *Kelly v. St. Luke's Hospital,* 826 S.W.2d 391, 396 (Mo.App.1992). Medical journal articles are not admissible as independent, substantive evidence. *Hemminghaus v. Ferguson,* 358 Mo. 476, 215 S.W.2d 481, 489 (1948). *See also Cooper v. Atchison, T. & S.F. RR. Co.,* 347 Mo. 555, 148 S.W.2d 773, 780 (1941), *cert. denied,* 313 U.S. 591, 61 S.Ct. 1116, 85 L.Ed. 1546 (1941) (medical textbooks). This is because if the articles were asserted as substantive evidence, they would be hearsay offered to prove the truth of the matter asserted. *Ball v. Burlington Northern RR. Co.,* 672 S.W.2d 358, 362 (Mo.App.1984).

■ Medical journal articles may be used on direct or cross-examination to test the knowledge of the expert witness and the reliability of his opinion. *See Stallings v. Washington Univ.,* 794 S.W.2d 264, 270–71 (Mo.App.1990) (direct examination); *Ball,* 672 S.W.2d at 363 (cross-examination). This is usually accomplished by reading from the publication and asking the expert if he agrees with the statement, as was done in this case with the three medical articles which were used at trial. *Langley v. Mi-*

---

to review for an abuse of discretion. See *Schneider v. Ashburn/Schneider Painting,* 849 S.W.2d 271, 273 (Mo.App.1993).

**2.** The dissent criticizes this study because it lacked sufficient prospective control data on the relationship between the triggers and the onset of

the heart attack. This simply goes to the weight the evidence should be given. The very argument the dissent makes, that the newly discovered evidence should be considered because it is more probative, proves the cumulative nature of the new articles.

*chael,* 710 S.W.2d 373, 377 (Mo.App.1986). However, this use of an article does not change the character of the evidence even if, as in *Stallings,* it is used on direct examination of a medical witness as data upon which the witness bases an opinion. § 490.065.3 RSMo.Supp.1993. The medical articles are still hearsay and remain as evidence that tests the credibility or knowledge of the witness; i.e., the facts or data upon which the witness bases the opinion. *Stallings,* 794 S.W.2d at 271; *Ball,* 672 S.W.2d at 362. The medical articles do not become transformed into substantive evidence.

In his brief, claimant states that both Drs. Bell and Crie testified that they were unaware of any medical text that conclusively established a link between heavy exercise and myocardial infarctions. Since the articles are inadmissible as independent evidence, the only use to which they could be put is to test the knowledge of the experts and to challenge the factual basis for their opinions. The claimant has not satisfied the fifth requirement of the test stated in *Williams.* Therefore, even if claimant had presented the journal articles to the Commission as newly discovered evidence, he failed to meet the requirements of Missouri case law. Point denied.

The decision of the Commission denying compensation is affirmed.

BRECKENRIDGE, J., concurs in separate opinion.

ELLIS, J., dissents in separate opinion.

BRECKENRIDGE, Judge, concurring.

I concur with the holding of Judge Hanna that under our standard of review this court is compelled to affirm the Commission because there is substantial evidence in the record which supports the Commission's decision. *Johnson v. City of Kirksville,* 855 S.W.2d 396, 398 (Mo.App.1993). This is true even though we might have reached a different result if hearing the case in the first instance. *Id.* I also concur in the denial of Mr. Wilson's claim that he is entitled to have

the cause remanded for consideration of newly discovered evidence.

The findings of the administrative law judge, as adopted by the Commission, identify as the critical issue whether or not there is a relationship between the physical activity of Mr. Wilson and his myocardial infarction. In reaching his conclusion that there is no relationship, the ALJ finds that "there is no medical literature which supports the claimant's theory of causation, that being heavy physical exertion as the cause or onset of the claimant's heart attack, and the doctors indicated that medical literature indicates the vast majority of heart attacks occur without attending excessive physical exertion."

As noted by Judge Ellis in his dissenting opinion, the studies [3] which Mr. Wilson denotes as "newly discovered evidence" identify a strong correlation between an episode of heavy physical exertion and the transient risk of myocardial infarction during the physical exertion and in the one hour period subsequent thereto. In contrast with Judge Hanna, I believe that such evidence is so material it would probably have produced a different result if the evidence was before the Commission, is not cumulative and could be utilized in a manner which would not impeach the character or credibility of a witness. Nevertheless, the cases cited by Judge Ellis do not convince me that Missouri law permits an appellate court to remand a civil case for consideration of "newly discovered evidence" which is presented for the first time on appeal.

ELLIS, Judge, dissenting.

The majority affirms the denial of Wilson's workers' compensation claim. I respectfully dissent because I believe this case should be remanded to the Commission with directions that Wilson be given an opportunity to present his newly discovered evidence to the Commission for consideration.

A more detailed recitation of the relevant facts is helpful in properly resolving this issue. At approximately 3:15 p.m. on July

---

**3.** The studies are Murray A. Mittleman *et al., Triggering of Acute Myocardial Infarction by Heavy Physical Exertion,* 329 New Eng.J.Med. 1677 (1993), and Stefan N. Willich *et al., Physical Exertion as a Trigger of Acute Myocardial Infarction,* 329 New Eng.J.Med. 1684 (1993).

25, 1990, Wilson reported to the Hillyard Chemical Company ("Hillyard") in St. Joseph, Missouri to pick up a load of freight for his employer. Around 3:30, he began loading some 13,000 pounds (6½ tons) of cargo into his trailer, the bulk of which (all but 2000 pounds) had to be loaded by hand. He worked as quickly as possible since Hillyard was a new customer and because he wanted to finish the job before 4:30 p.m., when Hillyard would have to start paying its freight dock employees overtime. Wilson further explained that while the Hillyard job would normally have been performed by two men, he loaded the entire 6½ tons of freight by himself because "they [the Hillyard docks] close at 4:30 and it is 54 miles from our terminal up there and by the time they got a man and a truck up there it would already have been closed."

U.S. Government weather records admitted into evidence at the hearing before the ALJ showed that at 4:00 p.m. the afternoon of July 25, 1990, the ambient temperature at Kansas City International (KCI) Airport, a reporting station some 35 miles from St. Joseph,[4] was 84 degrees and there was 65% relative humidity.[5] Wilson estimated that the temperature inside his unventilated, unpainted aluminum-roofed trailer, which was parked in the midsummer sun, was approximately 25 to 30 degrees higher than the ambient temperature.[6] Midway through the strenuous loading process, which took approximately 70 minutes and during which the Commission found Wilson "was engaged in heavy physical labor in extremes of heat at the end of the day, and at the docks of a new client which [he] was attempting to influence favorably by prompt efficient service," Wilson began to experience heart pain with associated jaw and chest discomfort.[7] The pain intensified and spread to his arms as he continued to exert himself, and, according to Wilson, was "awful bad" at the end of the job. While Wilson was able to finish loading the trailer, his symptoms did not improve and he was admitted to Heartland East Hospital in St. Joseph less than two hours after completing the Hillyard job. At the hospital, Wilson was under the care of Dr. Stanley Crie. Two days later, Wilson was transferred to North Kansas City Hospital, where he was treated by Dr. John Miller. He was later examined by Dr. Hubert Bell on behalf of ANR Freight.

Prior to the afternoon of July 25, 1990, Wilson's general health had been good. He testified he had passed a treadmill exercise test and heart examination conducted by his family doctor in 1989, as well as a mandatory Department of Transportation physical in January, 1990. Moreover, he reported to Dr. Crie on admission to Heartland East Hospital that before the accident, he was in good health, had never experienced exertional angina, and had never suffered from palpitations, dizziness, fainting or shortness of breath.

The Commission found there was "no question" Wilson suffered an acute myocardial infarction ("AMI" or heart attack) while loading his trailer on the afternoon of July 25, 1990. It also concluded "there is no dispute that at the time [Wilson] noticed his symptoms he was performing heavy labor, in high heat and humidity." The Commission nevertheless denied workers' compensation on the ground Wilson failed to sustain his burden to show there was a causal "relation-

---

4. I take judicial notice of this fact.

5. Weather records kept by the U.S. Government are competent, admissible, *prima facie* evidence of the facts stated therein. *Wheeler v. Fidelity & Casualty Co.*, 298 Mo. 619, 643–644, 251 S.W. 924, 931 (banc 1923). The distance of the KCI reporting station from St. Joseph did not render the records, which were otherwise admissible, irrelevant. *See Schucker v. Missouri Dep't of Natural Resources*, 703 S.W.2d 1, 4 (Mo.App. 1985) (upholding the admission of weather records taken 65 to 70 miles from the accident site).

6. *See Kripplaben v. Joseph Greenspon's Sons Iron & Steel Co.*, 227 Mo.App. 161, 165, 50 S.W.2d

752, 753 (1932) (stating as common knowledge the fact that metal structures "readily absorb and radiate heat"); *Lake v. Midwest Packing Co., Inc.*, 301 S.W.2d 834, 838 (Mo.1957) (claimant seeking compensation for heat-related injury is not required to establish the exact temperature at the work site by thermometer readings).

7. Wilson reported to one of ANR Freight's consulting physicians in an interview that he wasn't accustomed to doing the type of "extra-strenuous work" that immediately preceded his heart attack and had "never worked that hard before."

ship between the [work] activity being performed and the myocardial infarction."

At the hearing, the ALJ received evidence on causation from four witnesses. The only live testimony heard by the ALJ was from Wilson himself and his treating physician, Dr. Miller. ANR Freight introduced the depositions of Dr. Crie and Dr. Bell. The parties also offered various documentary evidence.

Wilson's treating physician, Dr. Miller, a board-certified cardiologist and internist, testified on Wilson's behalf. He testified that to a reasonable degree of medical certainty, Wilson's heavy physical exertion associated with the lifting of the 13,000 pounds of freight, coupled with his existing risk factors, the extreme heat and humidity in the trailer, and the fact he was hurrying to finish the job as quickly as possible, caused his heart rate and blood pressure to rise significantly, stressing his heart to the point where the oxygen demand outstripped the oxygen supply, ultimately inducing Wilson's heart attack.

After reviewing the testimony of Dr. Crie and Dr. Bell, both of whom testified on behalf of ANR Freight,[8] the Commission determined that "in light of the current status of the Missouri Law" on the compensability of heart attacks, Wilson's July 25, 1990 heart attack was "not compensable under the Missouri Workers' Compensation Act."

In this appeal, Wilson asks the court for relief based on newly discovered evidence: namely, two articles published in the December 2, 1993 issue of *The New England Journal of Medicine,* a leading medical journal, which detail the findings of separate scientifically-controlled medical studies on physical exertion as a trigger of AMI. The studies were first published three months after entry of the Commission's final award and nearly

two years after the hearing before the ALJ, while this appeal was pending.

The majority holds that it is impermissible for this court to remand Wilson's workers' compensation case to the Commission on the basis of this evidence. Judge Hanna also believes the evidence does not meet the requirements of Missouri case law on newly discovered evidence. I respectfully disagree on both counts.

Judge Hanna's opinion correctly states the general rule in Missouri that evidence extraneous to the trial court record should not be considered on appeal. Hanna op. at 7. In the interest of justice, however, the appellate courts of this state have, on at least three occasions, exercised their discretion to remand a case to the trial court on the basis of newly discovered evidence presented for the first time on appeal. *See State v. Mooney,* 670 S.W.2d 510, 515–516 (Mo.App.1984); *State v. Williams,* 673 S.W.2d 847, 847–848 (Mo.App.1984); *State v. Post,* 804 S.W.2d 862, 862 (Mo.App.1991).[9] The courts in *Mooney* and *Williams* were well aware that Rule 29.11 does not permit untimely requests to present newly discovered evidence and that there was no court rule, statute, or other precedent expressly authorizing them to remand the case to the trial court. *See Mooney,* 670 S.W.2d at 513, 515; *Williams,* 673 S.W.2d at 848. Rather, they acted pursuant to their "inherent power to prevent miscarriages of justice in a proper case." *Mooney,* 670 S.W.2d at 515–16.[10] The rationale for this extraordinary procedure was aptly stated in *Williams:*

> That this evidence was not discovered before the expiration of the time for the filing of a motion for new trial should not defeat the laudable concept of a new trial based on such evidence.... Mindful though we are of the exclusivity of this Court's juris-

---

8. Their testimony is recounted at pp. 661–662 of Judge Hanna's opinion.

9. Other courts have acknowledged their power to do so, but declined to use it under the particular circumstances presented in the case. *See, e.g., State v. Hamilton,* 732 S.W.2d 553, 555–557 (Mo.App.1987); *McCauley v. State,* 866 S.W.2d 892, 894–895 (Mo.App.1993); *State v. Ramsey,* 874 S.W.2d 414, 417–418 (Mo.App.1994).

10. *See also Hamilton,* 732 S.W.2d at 555; *McCauley,* 866 S.W.2d at 894; *Ramsey,* 874 S.W.2d at 417 (all referring to the appellate court's "inherent power" to consider newly discovered evidence presented for the first time on appeal and to decide whether to remand the cause to the trial court on the basis of that evidence).

diction once a notice of appeal is properly filed, we are equally cognizant of the perversion of justice which would occur if we were to close our eyes to the existence of the newly discovered evidence.... Under the unique circumstances of this case, we are willing to overlook the time constraints of Rule 29.11 as they relate to the newly discovered evidence.

673 S.W.2d at 848; *see also Mooney*, 670 S.W.2d at 515 ("[A]ppellant must have some forum in the judicial system to present this issue, particularly where the case is still in the process of appeal.")

While *Mooney, Williams*, and *Post* are admittedly all criminal cases,[11] there is also Missouri authority for remanding a *civil* case to the trial court on the basis of evidence first presented to the appellate court while the case was on appeal. *See Mulroy v. Supreme Lodge of the Knights of Honor*, 28 Mo.App. 463, 475 (1888) (appellate court may exercise its "discretion to remand where it seems that the ends of justice would be subserved by so doing.") *Curry v. Thompson*, 247 S.W.2d 792, 798 (Mo.1952) (suggesting that remand is appropriate if the "after-trial facts" presented to the appellate court "are of such *decisive and conclusive character* as to render a different result reasonably certain") (emphasis in original). It is also worth observing that three of the six out-of-state cases cited in support of the seminal holding in *Mooney* were civil cases. *See Mooney*, 670 S.W.2d at 515.

In particular, a *workers' compensation claimant* such as Wilson should be entitled to some judicial forum in which to present new evidence discovered while his case is on ap-

peal. To begin with, there is no question Rule 84.13(c), the civil rule allowing appellate courts to consider unraised or unpreserved plain errors "affecting substantial rights" when it finds that a manifest injustice or a miscarriage of justice would result, is applicable to appellate review of the Commission's workers' compensation decisions. *West v. Posten Constr. Co.*, 804 S.W.2d 743, 745 (Mo. banc 1991). A remand in this case would also be fully consistent with the remedial nature of appeals in workers' compensation cases and the philosophy underlying Missouri's workers' compensation statutes. Statutes that are remedial in nature are to be liberally construed so as to effect their beneficial purpose. *State ex rel. LeFevre v. Stubbs*, 642 S.W.2d 103, 106 (Mo. banc 1982). As explained by the Court in *West, supra:*

> The fundamental purpose of the Workers' Compensation Law is to place upon industry the losses sustained by employees resulting from injuries arising out of and in the course of employment. The law is to be broadly and liberally interpreted with a view to the public interest, and is intended to extend its benefits to the largest possible class [of claimants]. Any doubt as to the right of an employee to compensation should be resolved in favor of the employee.

804 S.W.2d at 745–746 (quoting *Wolfgeher v. Wagner Cartage Serv., Inc.*, 646 S.W.2d 781, 783 (Mo. banc 1983)) (internal ellipses omitted).[12]

So, while appellate review of a workers' compensation case may normally be limited to the four grounds specified in § 287.495.1,

---

11. After discussing the factual backgrounds of these cases, Judge Hanna concludes that "[t]hose extraordinary circumstances do not exist" in the case at bar. Hanna op. at 9. I disagree. If the newly discovered evidence in those cases had been scientific in nature, say, for example, new research demonstrating that crucial forensic evidence used to convict the defendant was in fact grossly inaccurate or scientifically unreliable, the parallels would be much clearer.

12. Judge Hanna relies on *Knuckles v. Apex Indus., Inc.*, 762 S.W.2d 542 (Mo.App.1988) and *Abrams v. Ohio Pac. Express*, 819 S.W.2d 338 (Mo. banc 1991) for the proposition that the "procedures outlined for appeal" by § 287.495.1 are "mandatory" and must be strictly complied

with despite this rule of liberal construction. Hanna op. at 7. However, the courts in *Knuckles* and *Abrams* were both interpreting § 287.480, which requires a party wishing to appeal an ALJ's decision to the full Commission to file an application for review within twenty days from the date of the ALJ's award, *not* § 287.495.1, which concerns appeals to this court. *See Knuckles*, 762 S.W.2d at 543; *Abrams*, 819 S.W.2d at 341–42. Thus, they are not controlling here. In any case, as observed *supra*, this court's power to remand on the basis of newly discovered evidence presented for the first time on appeal is inherent and does not stem from any statute or rule.

*see* Hanna op. at 8, I believe this court has the inherent, unenumerated power to prevent manifest injustice in an appropriate case by remanding the case to the Commission for consideration of newly discovered evidence presented by a claimant for the first time on appeal.

Furthermore, there is Missouri precedent for remanding a workers' compensation case to the Commission on the basis of evidence presented for the first time on appeal. In *Mitchell v. Knutson*, 234 Mo.App. 832, 137 S.W.2d 648 (1940), the Commission granted an award of compensation which was originally to be paid on a weekly basis but was later commuted to a lump sum at the claimant's request. On appeal, the employer argued that the Commission had no statutory authority to grant a lump sum award in the case and that even if it did, there was not sufficient competent evidence in the record to warrant the making of the award. After reviewing the applicable case law and the evidence adduced before the Commission, the court summarily rejected both of these arguments. 234 Mo.App. at 838, 137 S.W.2d at 652. However, the employer also alleged it had made a series of weekly compensation payments to the claimant during the pendency of the appeal which "materially reduced" the total amount of compensation due him.[13] 234 Mo.App. at 836, 137 S.W.2d at 650. The employer requested that the appellate court remand the case to the Commission so that it could receive some sort of credit for those payments. The appellate court, noting that it was normally "bound by the evidence as presented to the trial court" as shown by the record submitted on appeal, acknowledged that the employer's point relied on raised "a novel assignment of error" and that there was no case authority covering the situation. 234 Mo.App. at 839, 137 S.W.2d at 652. It therefore affirmed the judgment awarding the lump sum and re-manded the case to the Commission with directions that it determine the amount and number of deferred payments due the claimant after adjustment for "the weekly payments, if any, that have been made while this cause has been pending." *Id.*[14]

Finally, courts in other jurisdictions have expressly held that where justice and equity would be served by doing so, an appellate court may remand a case to the state workers' compensation tribunal on the ground of newly discovered evidence found after the tribunal's final decision and presented to the appellate court while the case was on direct appeal. *See, e.g., Hill v. United Timber & Lumber Co.*, 221 Miss. 473, 73 So.2d 247, 248 (1954) (ordering a remand as "necessary for the administration of justice"); *Crimen v. Fidelity & Casualty Co.*, 249 La. 1071, 193 So.2d 249, 251 (1966) (remanding the case to permit the introduction and consideration of the new evidence "in the interest of justice"); *Sorenson v. La Pompadour, Inc.*, 187 Minn. 665, 246 N.W. 114 (1932); *Shelton v. Spic & Span Dry Cleaners*, 2 N.C.App. 528, 163 S.E.2d 288 (1968); *see also Harris v. Frank L. Blum Constr. Co.*, 10 N.C.App. 413, 179 S.E.2d 148, 153 (1971).

Judge Hanna goes on to assert that even if a remand were permissible, Wilson's newly discovered evidence does not meet two, and possibly three, of the five requirements set forth in Missouri case law regarding such evidence. Hanna op. at 9–10 (*citing Williams v. McCoy*, 854 S.W.2d 545, 554 (Mo.App.1993)). Again, I disagree.

To properly understand the nature and probative value of the new evidence Wilson wants to present to the Commission, it is necessary to carefully review the two articles reporting the results of the scientific studies and to consider them in relation to the evidence and findings in this case. The first study,[15] involving nearly 1200 patients, used

---

**13.** The opinion does not say precisely how this allegation was supported, whether by affidavit or otherwise. It is clear, however, that any such support was dehors the record below and that the employer so acted because "there [was] no other way to raise the point" for appellate review. 234 Mo.App. at 836, 137 S.W.2d at 650.

**14.** The statute relating to appellate review of the Commission's award in *Mitchell*, § 3342, RSMo 1929, contained exactly the same language used in § 287.495.1.

**15.** Stefan N. Willich *et al., Physical Exertion as a Trigger of Acute Myocardial Infarction*, 329 New Eng.J.Med. 1684 (1993) ("Willich").

multivariate logistic-regression analysis to document a substantially increased risk of AMI during strenuous physical activity or within the one-hour period after it, with a particularly high increase in risk in patients who usually engaged in exertional physical activity less than four times a week. As compared with periods of little or no physical exertion, the relative risk ratios for myocardial infarction during or within an hour of strenuous exercise were 2.1 for the population as a whole (which translates into an 110% increase in risk) and 6.9 (a 590% increase in risk) for the more sedentary subgroup. Willich at 1684, 1686–87. The results suggested to the authors of the study that "it is not only patients with known, previously diagnosed coronary artery disease who may be at increased risk during exertion, but also those without a previous event—that is, those with 'silent' coronary disease." *Id.* at 1689.

The other study,[16] also involving around 1200 patients, demonstrated that "discrete episodes of physical exertion can increase the short-term risk of myocardial infarction." Mittleman at 1681. In particular, "an episode of heavy physical exertion was associated with a transient risk of myocardial infarction in the subsequent hour that was *5.9 times higher* than the risk during periods of lighter exertion or no exertion." *Id.* at 1680 (emphasis added). While patients who were habitually sedentary had an astoundingly high relative risk of 107, even among those who reported heavy physical exertion five or more times a week, the relative risk of suffering a heart attack during or within an hour of heavy exertion was 2.4, which translates into an 140% increase in risk. *Id.*[17] The Mittleman study further concluded that "approximately *80 percent of cases that occurred within one hour after an episode of exertion were triggered by it*" in the sense

the exertion was "the final component cause" of the patient's myocardial infarction. *Id.* at 1682 (emphasis added).

Judge Hanna questions whether the new evidence is so material it would probably have produced a different result had it been presented to the Commission. Hanna op. at 10. "To satisfy this requirement, the newly discovered evidence need only be 'credible and reasonably sufficient to raise a substantial doubt in the mind of a reasonable person as to the result in the event of a new trial.' " *State v. Stone,* 869 S.W.2d 785, 787 (Mo.App. 1994) (quoting *State v. Jennings,* 326 Mo. 1085, 1094, 34 S.W.2d 50, 54 (1930)). Wilson's newly discovered evidence meets this standard. If believed, these controlled clinical studies affirmatively demonstrate the existence of a link between heavy physical exertion and myocardial infarction using recognized medical, scientific and statistical techniques. If presented in a proper and admissible manner to and deemed credible by the Commission, they also constitute highly persuasive evidence that Wilson's work activities on the afternoon of July 25, 1990 subjected him to a massive increase in the risk of a heart attack and probably triggered the one he had while singlehandedly loading 13,000 pounds of freight in just over an hour under conditions of extreme heat and humidity. They therefore meet the third requirement set forth in *Williams v. McCoy, supra.*

Next, Judge Hanna claims the studies are merely "cumulative to evidence considered by the Commission," specifically referring to Dr. Crie's comments concerning "several articles printed in authoritative medical studies [linking] heart attacks to physical exertion," Hanna op. at 10,[18] and thus, he reasons, the new evidence fails to meet the fourth requirement set out in *Williams v. McCoy.* A close look at Dr. Crie's testimony about the

---

**16.** Murray A. Mittleman *et al., Triggering of Acute Myocardial Infarction by Heavy Physical Exertion,* 329 New Eng.J.Med. 1677 (1993) ("Mittleman").

**17.** While patients fitting into the more sedentary categories had a particularly high risk for heart attack during or within an hour of physical exertion, the relative risk ratios for *all* study participants, including those who reported regular heavy physical exertion (four to five or more

times a week), were significantly elevated. *See* Willich at 1687 (Table 4); Mittleman at 1681 (Table 3).

**18.** All three of these articles were referred to earlier in Judge Hanna's opinion. *See* Hanna op. at 5. None of this evidence of causation was mentioned (even in passing) by the Commission in its award denying compensation.

articles demonstrates the error in this argument. The fact is that while the articles and studies referred to by Dr. Crie strongly suggested the existence of a connection, none of them were controlled clinical studies demonstrating a statistically significant link between heavy physical exertion and the onset of a heart attack.

The first two items mentioned by Dr. Crie included Braunwald's textbook, *Heart Disease,* and an article entitled "The Law and the Heart" by Dr. Elliot L. Sagall contained in a different textbook edited by Hurst called *The Heart.* This extract from the transcript, in which Dr. Crie is being examined by ANR Freight's attorney, clearly demonstrates my point regarding those two items:

Q. Let's skip down here to a portion of this that I think Mr. Bell [Wilson's attorney] asked you about, I may be mistaken. But in any event, the text does state, "Thus, although *adequate control studies have not been carried out,* there is *suggestive* evidence that heavy exercise may play a precipitating role in some patients." Is that what the text [Braunwald's textbook, *Heart Disease* ] states?

A. Yes.

Q. Now, in looking at that text, the word "suggestive" is in italics; is that correct?

A. Yes.

Q. That article [Dr. Sagall's article contained in *The Heart* ] and this text does not say that there is *conclusive* evidence that heavy exercise may play a precipitating role in some patients, does it?

A. No.

Q. Do you know of any text that states that heavy exercise or exertion conclusively plays a precipitating role in an acute myocardial infarction?

A. No.

\* \* \* \* \* \*

Q. And other than this one article that you have referred to in Braunwald's textbook of cardiovascular medicine entitled *Heart Disease,* do you know of any other medical treatise or textbook that says ... there is anything more than *suggestive* evidence that exercise may play a precipitating role in some patients?

A. No, I don't know of any textbook that says that.

(Emphasis added.) [19] Indeed, the Commission specifically referred to this testimony in its award: "In fact Dr. Crie testified there are no texts that state conclusively heavy exercise or exertion plays a precipitating roll [sic] in an acute myocardial infarction."

The third item discussed by Dr. Crie was a study published in *The American Journal of Cardiology* [20] in which a group of heart attack victims were asked to report what they thought might have triggered their AMI. Dr. Crie testified that the results of the survey showed that the most commonly reported possible triggers were emotional upset and physical activity. However, the questions put to Dr. Crie about this study and his answers to those questions in no way demonstrate that it was designed to address the causative role of those triggers in clinical detail or whether its authors collected sufficient prospective control data on the precise nature, duration, and time relation to onset of AMI to the possible triggers to ascertain the relative risk of onset during physical exertion. Thus the Tofler study was completely different from the Willich and Mittleman studies, which were designed to quantify the acute short-term risk of AMI after physical exertion and were able to control for other factors.

What's more, the authors of the Willich and Mittleman studies were acutely aware of the severe limitations of prior research in the area. The Willich study used various methodological techniques to overcome the problems with those studies, which were "based on anecdotal reports, studied selected patient populations, or were limited by the lack of adequate control data." Willich at 1684.

---

19. In its award the Commission summarized Crie's opinion testimony on this issue as follows: "[T]here is no medical literature which supports the claimant's theory of causation." This characterization is totally unsupported by the record.

20. Geoffrey H. Tofler *et al., Analysis of Possible Triggers of Acute Myocardial Infarction,* 66 Am.J.Cardiology 22 (1990) ("Tofler").

Moreover, the authors of the Mittleman study wrote:

> Despite anecdotal evidence suggesting that heavy physical exertion can trigger the onset of acute myocardial infarction, *there have been no controlled studies* of the risk of myocardial infarction during and after heavy exertion, the length of time between heavy exertion and the onset of symptoms (induction time), and whether the risk can be modified by regular physical exertion.

Mittleman at 1677 (emphasis added).[21]

Judge Hanna also refers to Dr. Miller's testimony that about 50% of myocardial infarctions were causally related to physical exertion, while 50% were not. Hanna op. at 10. This is the sum total of the testimony Judge Hanna claims renders the Willich and Mittleman studies merely "cumulative":

> Q. What is the epidemiology of heart attacks with respect to numbers caused in combination with exertion and numbers caused otherwise?
> A. There is no—it is probably about 50/50.

It is obvious that this rough, off-the-cuff "guesstimate," the basis for which was never demonstrated or explained, does not rise to the level of the newly discovered medical research discussed *supra*. Clearly, Wilson's newly discovered evidence is not merely cumulative to that considered by the Commission.[22]

Finally, Judge Hanna claims that the studies do not meet the fifth requirement set forth in *Williams v. McCoy*, arguing that they are hearsay and therefore inadmissible as independent, substantive evidence. Hanna op. at 11. However, the fifth prong of *Williams* does not require that the newly discovered evidence be admissible as substantive proof of a particular fact. It simply requires that the evidence not be offered merely "to impeach the character or credit of a witness." 854 S.W.2d at 554; *see also Stone,* 869 S.W.2d at 789 (new trial may be granted on basis of newly discovered evidence which is partly impeaching). While impeaching the credibility of Drs. Bell and Crie is certainly one use to which the studies could be put, they could also be used during the *direct examination of Dr. Miller.* Section 490.065.3, RSMo Supp.1993, provides, in pertinent part:

> The facts or data in a particular case upon which an expert bases an opinion ... may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions ... upon the subject and must be otherwise reasonably reliable.

In *Stallings v. Washington Univ.*, 794 S.W.2d 264, 272 (Mo.App.1990), the court stated that this statute authorizes testimony on direct examination about medical studies relied upon by a physician to explain some of the information and knowledge upon which he relied in formulating a medical opinion. Furthermore, the *Stallings* court held that even without this "express statutory permission," expert medical witnesses in that case were properly permitted, over a hearsay objection, to testify on direct examination about the contents of a lecture delivered during a medical seminar one of the experts attended, and recent medical studies they had reviewed to explain part of the information and knowledge upon which they based their medical opinions in the case. *Id.* See also *Siebern v. Missouri–Illinois Tractor & Equip. Co.*, 711 S.W.2d 935, 940 (Mo.App.1986) (allowing an expert in a tractor rollover case to testify on direct examination regarding studies made under authority of the U.S. Bureau of Mines involving rollover tests of heavy equipment of

---

**21.** In particular, the Tofler study about which Dr. Crie was questioned was described by the authors of the Mittleman study as "lack[ing] control data." Mittleman at 1677 & n. 1.

**22.** Judge Hanna reasons that because the evidence considered by the Commission "appears" to show a causal link between heavy physical exertion and AMI, Wilson's newly discovered evidence is merely cumulative. Hanna op. at 10–11 & n. 2. However, the differences between the

evidence presented to the Commission and the quantitative, highly controlled, scientifically conducted medical research reported in the two articles are both patent and legally significant. Further, it is clear from the language of the award that the non-"conclusive" nature of the studies before it was an important factor in the Commission's decision to deny compensation. Thus, the differences cannot be ignored.

different sizes and weights and noting that "these studies were properly admitted as a basis for expert opinion"); *Albers v. Hemphill Contracting Co., Inc.*, 740 S.W.2d 660, 663 (Mo.App.1987) ("It is, after all, proper to allow into evidence hearsay that is otherwise trustworthy and necessary for the purpose of providing the foundation for an expert opinion.") The studies could, therefore, be used on remand in a proper, admissible, non-impeaching manner.

One final observation is in order. Due to the limited research in this area, the gap between the abstract medical theory that it is "possible" for a heart attack to be caused by extreme physical exertion and the concrete legal finding that a given heart attack was "probably" triggered by the claimant's physical activities is generally bridged by the acceptance of expert medical opinions formed without the benefit of reasonably complete clinical data. This has prompted some courts to question the fairness of the present system of determining causation in such cases. See, e.g., *Clayton v. State Compensation Dep't,* 253 Or. 397, 454 P.2d 628, 632 (1969) ("Because medical opinion on the effect of [physical] exertion and stress in heart attack cases rests upon such limited scientific knowledge there is reason to question the fairness of our present system of determining the issue of medical causation in these cases.") This dearth of scientific knowledge makes it even more critical that the Commission be permitted to consider the new medical research published while Wilson's case was on appeal. As the Supreme Court of New Jersey recently observed in affirming an award of workers' compensation benefits to a claimant who suffered a heart attack shortly after performing physically strenuous activities at work:

> When the possibility of causal connection is accepted, we cannot deny relief ... simply because science is unable decisively to dissipate the blur between possibility and probability. In such circumstances judges must do the best they can, with the hope that their decisions square with the truth, and *with a willingness to consider in succeeding cases whatever contribution scientific advances may offer.*

*Hellwig v. J.F. Rast & Co., Inc.,* 110 N.J. 37, 538 A.2d 1243, 1249 (1988) (citation and quotation omitted, emphasis added).

The newly discovered evidence presented by Wilson is, by all indications, pioneering, controlled, highly probative medical research shedding new light on a thorny issue which has plagued workers' compensation claimants, doctors, lawyers and courts in this state for years. I believe this court should be willing, in the interest of justice, to allow the Commission to consider whatever contribution this research offers in the proper resolution of Wilson's case. I cannot, therefore, join the majority in turning a deaf ear to Wilson's prayer for relief in the form of a remand to the Commission.

I dissent.